# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

ELAMIN MUHAMMAD, also known as EL MUHAMMAD,

    Defendant-Appellant.

FOR PUBLICATION
October 2, 2018
9:00 a.m.

No. 338300
Muskegon Circuit Court
LC No. 14-065263-FC

Before: MURRAY, C.J., and CAMERON and LETICA, JJ.

MURRAY, C.J.

Defendant, Elamin Muhammad, appeals by right his bench trial convictions of armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b(2). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to five years' imprisonment for the felony-firearm conviction, and 25 to 38 years' imprisonment for the armed robbery conviction. The principal issue to decide, and which is one of first impression for our appellate courts, is whether the trial court abused its discretion in admitting expert testimony regarding results from STRmix probabilistic genotype testing. We conclude that the trial court did not abuse its discretion in admitting the results from this testing, and because there are no other reversible errors, we affirm.

## I. ADMISSIBILITY OF EVIDENCE

Defendant argues that the trial court erred in admitting expert testimony on deoxyribonucleic acid (DNA) evidence and in denying his motion to suppress evidence of a shoe that was left at the crime scene. The DNA expert testified at a pretrial hearing regarding STRmix probabilistic genotype testing, a more recent analysis of DNA testing and a relatively new method of evaluating complex mixtures.

We review a trial court's decision to admit evidence for an abuse of discretion. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). "Preliminary questions of law, such as whether a rule of evidence or statute precludes the admission of particular evidence, are reviewed de novo . . . ." *Id*. Necessarily, a trial court abuses its discretion when it admits evidence that is inadmissible as a matter of law. *Id*.

-1-

## A. DNA EVIDENCE

### 1. BACKGROUND FACTS

At trial, the victim of the robbery could not identify the perpetrator because the perpetrator wore a mask that covered his face. While fleeing the scene, a shoe came off of the perpetrator's foot as the victim shot at him with a weapon. Police recovered the shoe and sent it to the Michigan State Police Forensics Laboratory. At the laboratory, police obtained a sample from the shoe but could not perform a reliable DNA analysis because the sample contained a mixture of four different donors. Police then sent the shoe to Mitotyping Technologies, a private forensic laboratory in Pennsylvania.

Charity Holland was a DNA analyst at Mitotyping and she testified as an expert in DNA analysis. On November 25, 2014, Holland received a size 9 left shoe from the Norton Shores Police Department. The insole of the shoe was outside the shoe in a plastic bag. Holland took a sweat sample from the toe region of the insole of the shoe for testing. She described the sample as a "low level DNA profile," and it was mixed with another donor. She agreed that the entire DNA profile was "degraded," and that defendant could not be excluded from the sample.

Holland consulted with another expert, Dr. John Buckleton, Ph.D., about probabilistic genotyping of DNA samples that contain more than one donor. Specifically, after Holland obtained a sample with more than one donor, Dr. Buckleton took the sample that Holland developed from the shoe insole and performed statistical interpretation of the profiles using a software program called STRmix. Before trial, defendant objected to the results of Dr. Buckleton's use of probabilistic genotype software, and the trial court held a *Daubert*[1] hearing. At the hearing, the prosecution primarily relied on the expert testimony of Dr. Buckleton, and the defense presented the expert testimony of Dr. Karl Reich, Ph.D.

On December 17, 2015, the trial court entered an opinion and order ruling that the results of the STRmix probabilistic genotyping analysis were admissible under MRE 702. The trial court found that STRmix had received adequate validity testing, that there were multiple validation tests, and that the Erie County Forensic Laboratory, the San Diego Forensic Laboratory, the United States Army, and the FBI had all conducted independent validation studies on STRmix. The trial court also noted that Dr. Buckleton testified that mock samples mimicked field samples and that another expert conducted validation studies in compliance with applicable guidelines. Furthermore, Dr. Buckleton had submitted the validation studies for peer review, and the New York Commission on Forensic Science considered its DNA Subcommittee recommendation and approved STRmix for case work. Although the prosecution filed a posthearing "clarification" of Dr. Buckleton's testimony in which it alerted the trial court to the miscalculation of some results in Queensland, Australia, the trial court noted that the miscoding involved a three-person mixture.

The trial court continued, explaining:

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 590; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Following the NYSCFS approval, at least two cases in New York utilized opinions based on STRmix evaluations. The U.S. Army used the STRmix program for evidence submitted in court-martials following validation testing by laboratories that adhered to the SWGDAM standards. Many of these validation tests were published for peer review. The only evidence submitted of any criticism of the validation testing's methodology came from Dr. Reich. He acknowledged that the only other critic he was aware of was a scientist employed in his laboratory who had been involved in the development of [TrueAllele] . . . To the contrary, there is general acceptance of STRmix among very significant figures in the field of DNA analysis. It is also clear that STRmix validity testing comported with recognized standards in this discipline and was subjected to peer review publications along with the program's algorithm.

Another factor ripe for consideration is whether mathematical experts outside litigation rely upon the concepts forming the STRmix program. The concept that STRmix relies upon is probabilistic genotyping and the mathematical principle supporting probabilistic genotyping is Monte Carlo Markov Chain (MCMC). This technique is widely used in weather forecasting, computational biology and linguistics, genetics, engineering, physics, aeronautics, the stock market, and social sciences.

The trial court concluded by holding as follows:

1. Multiple entities have extensively tested STRmix for validity, 2. The testing process adhered to generally accepted standards, 3. Experts in the field analyzed STRmix through peer review publication, 4. Of the hundreds of tests done, the only errors discovered involved extremely low levels of DNA but no specific error rate has been developed, 5. The concept of probabilistic genotyping is accepted in the community of DNA analysts and is in the process of achieving preferred status over conventional approaches like CPI, 6. The MCMC principles underlying probabilistic genotyping and the STRmix program are relied upon by experts in many fields outside the context of litigation, and 7. Courts in New York have admitted STRmix results, and courts in Pennsylvania, Virginia, New York and Ohio have admitted results from a program based upon similar principles. STRmix meets the reliability criteria for admission under MCR 702.

At trial, before Dr. Buckleton testified for the prosecution, the trial court admitted the testimony from the *Daubert* hearing as substantive evidence.[2] Dr. Buckleton then testified that

---

[2] In addition, following Holland's testimony, defendant moved to suppress the DNA evidence on grounds that Detective Kyle Neher of the Norton Shores Police Department contaminated the evidence when he removed the shoe insole from the shoe in the presence of defendant's DNA sample, and took the insole to a photography shop for photographing. The trial court denied the motion, holding that Detective Neher's conduct went to the weight of the evidence as opposed to its admissibility.

he applied the STRmix statistical interpretation to the DNA sample that Holland developed at Mitotyping, and that the results of the STRmix analysis showed that "[the] chance of someone [other than defendant] producing this profile is one in one hundred billion." Dr. Buckleton agreed that the DNA sample showed the presence of a minor donor and that it was possible that the minor donor wore the shoe during the robbery.

## 2. ANALYSIS

MRE 702 governs the admissibility of expert witness testimony and it provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [MRE 702.]

MRE 702 incorporates the standards of reliability that the United States Supreme Court established in *Daubert, v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993), in interpreting the equivalent federal rule of evidence. See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 781-782; 685 NW2d 391 (2004). Under *Daubert*, a trial court must "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 US at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-593. Some factors that bear on the trial court's inquiry include: (1) whether the scientific knowledge or technique can, and has been, tested, (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," (5) whether there is "general acceptance" of the scientific technique. *Id*. at 593-594. However, these factors are not exclusive; instead, "[m]any factors will bear on the inquiry . . . ." *Id*. at 593.

"Pursuant to *Daubert* and MRE 702, 'the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes.' " *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008), quoting *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007) (opinion by DAVIS, J.). In other words, " '[t]he inquiry is not into whether an expert's opinion is necessarily correct or universally accepted,' " it " 'is into whether the opinion is rationally derived from a sound foundation.' " *Unger*, 278 Mich App at 217 (citation omitted). "The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony." *Id*. at 217-218.

In applying the *Daubert* factors to the facts it found controlling, the trial court did not abuse its discretion in admitting the STRmix results at trial.

a. TESTING

The first *Daubert* factor concerns whether STRmix can be or has been tested. See *Daubert*, 509 US at 593. The trial court found that it has been sufficiently tested, and facts in the record support that conclusion. Specifically, Dr. Buckleton testified that the mathematics underlying the software involve the well-established MCMC method, and that STRmix underwent various different validation methods. For instance, the development team performed the first 500 steps of the MCMC chain by hand, performed "true donor" and "false donor" tests, and tested STRmix against other software. Dr. Buckleton testified that STRmix provided a different answer from TrueAllele[3] in less than 1% of trials.

As the trial court recognized, other laboratories subjected STRmix to validation studies, and STRmix has been approved for use by four forensic laboratories in the United States. Although Dr. Reich testified that STRmix could not account for field conditions, Dr. Buckleton testified that testing of STRmix had accounted for "real world situations." Specifically, DNA samples were degraded and then tested with the software. Dr. Buckleton testified that STRmix was subjected to "massive tests of false donors, hundreds of millions," and that the software had not made a "false positive" identification. Dr. Buckleton disagreed with Dr. Reich's testimony that STRmix could not account for field conditions, explaining that STRmix was tested against cases from the field to recreate field conditions in the laboratory. Similarly, an expert from the Erie County Forensic Laboratory completed a validation process that included testing multiple known samples. STRmix confirmed the laboratory's previous findings. Consequently, the trial court did not clearly err in concluding that STRmix has been properly tested.

b. PEER REVIEW

The second *Daubert* factor concerns whether the methodology has been subjected to peer review. See *Daubert*, 509 US at 593. "That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert v Merrell Dow Pharm, Inc*, 43 F3d 1311, 1318 (CA 9, 1995). The trial court did not clearly err in its findings that the STRmix methodology has been subjected to peer review. Dr. Buckleton testified that STRmix has been subjected to peer review; he identified a list of 16 peer-reviewed articles involving test results of STRmix. The NIST[4] presented scientific information on probabilistic genotyping, and SWGDAM[5] published guidelines for probabilistic genotyping in June 2015. In addition, STRmix was presented to the New York Commission on Forensic Science and to the Commission's DNA Subcommittee. The Commission adopted the DNA Subcommittee's recommendation to accept STRmix for casework. Record evidence supports the trial court's findings.

---

[3] TrueAllele is a competing DNA software that is generally accepted in the scientific community.

[4] National Institute for Standards Technology.

[5] Scientific Working Group on DNA Analysis Methods.

## c.  KNOWN/POTENTIAL ERROR RATE

The third *Daubert* factor concerns the known or potential error rate of the method or theory.  See *Daubert*, 509 US at 594.  Again, the record evidence supports the trial court's findings.  Specifically, Dr. Buckleton testified that he had never detected a "false positive or false negative" with STRmix.  He stated that a "zero error rate" would be "a big call," but he had never discovered an error.  According to Dr. Buckleton, the software has been subjected to numerous validation studies and there were no known errors.  Additionally, several forensic laboratories have conducted validation studies, and the validation studies have been confirmed.  Dr. Buckleton testified that all but one of the states in Australia have been using STRmix and that there have been 40,000 cases processed in Australia without any discernable error.  And, although after the *Daubert* hearing the prosecution acknowledged that it became aware that a previous version of STRmix had a "miscode," which "led to the need to recalculate Likelihood Ratios in a very small number of cases," as the trial court recognized, the code only impacted samples of more than two donors and the miscode had been replaced and was not used in this case.

## d.  STANDARDS CONTROLLING OPERATION

The fourth *Daubert* factor involves "the existence and maintenance of standards controlling the technique's operation."  See *Daubert*, 509 US at 594.  Dr. Buckleton testified that STRmix is based on algorithms, and he explained the principles underlying STRmix:

> So if I split the construction of the software into having two fundamental principles, the mathematical principles and the molecular biology principles, the mathematical principles are standard mathematical principles and they date back to the early 1900s.  And they're called (indistinguishable) and they're a dominant method now in mathematical procedures treating these types of problems.  If we come to the molecular biology these are based on empirical studies of the variability of peak and stutter heights in different multiplexes and at different template levels and they're published in peer-reviewed articles.

As the trial court found, and as testified to by Dr. Buckleton, the mathematics underlying STRmix is the Monte Carlo Markov Chain (MCMC), a well-established scientific principle that is used in weather forecasting, genetics, engineering, the stock market, and other well-established fields.  Again, the trial court's findings were not clearly erroneous.

## e.  GENERAL ACCEPTANCE

The trial court found that STRmix is a generally accepted method.  The evidence supports that conclusion, showing that four forensic laboratories within the United States have validated and begun using STRmix.  In addition, STRmix has been in use within Australia for a number of years.  Dr. Buckleton testified that SWGDAM has recognized probabilistic genotyping and published guidelines for probabilistic genotyping in June 2015.  In addition, the

New York Commission on Forensic Science[6] adopted the recommendation of its DNA Subcommittee to approve STRmix for casework at the Erie County Forensic Laboratory.

Having considered these factors as a whole, we conclude that the trial court did not abuse its discretion in admitting the DNA evidence. As discussed above, the trial court's findings on the relevant factors were not clearly erroneous because they had ample support in the evidence. That evidence, primarily based upon Dr. Buckleton's testimony, showed that STRmix utilizes well-established mathematical and scientific methods and that the software has undergone various validation studies. The validation studies included manual calculations, true and false donor tests, and tests against other software. STRmix has also been validated by four forensic laboratories in the United States and is being validated by other laboratories. Dr. Buckleton testified that the validation studies subjected STRmix to field conditions and that he was unaware of any false positive or false negative identification.

In addition, STRmix was subjected to peer review and approved for casework by the New York Commission on Forensic Science. More generally, probabilistic genotyping has been subjected to scrutiny by SWGDAM and the NIST. Dr. Buckleton testified that he was unaware of any false positive or false negative results and that numerous validation studies did not produce any known errors. Moreover, STRmix has been validated and was in use at four different laboratories in the United States.

Based on this record, the trial court did not abuse its discretion in concluding that the DNA evidence was admissible under MRE 702. The trial court's findings on the relevant factors supported its conclusion that the DNA evidence was admissible, and thus the trial court properly discharged its gatekeeper role. While Dr. Reich offered testimony to counter Dr. Buckleton, the trial court was free to give more weight to Dr. Buckleton's testimony. See *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014) (noting that "[t]his Court will not interfere with the trier of fact's determinations regarding the weight of the evidence or the credibility of witnesses").[7]

---

[6] The Commission on Forensic Science was composed of scientists and attorneys, and the DNA Subcommittee was composed entirely of scientists.

[7] In his Standard 4 brief, defendant argues that the STRmix evidence should have been suppressed under MRE 403. He also appears to argue that Dr. Buckleton's testimony was inadmissible because it was based on a sample that was "subterfuge." However, we have already concluded that the trial court did not abuse its discretion in admitting the DNA evidence. To the extent that defendant argues trial counsel should have raised an objection under MRE 403, that argument lacks merit because the probative value of the evidence was not substantially "outweighed by the danger of unfair prejudice." MRE 403. Accordingly, trial counsel was not deficient for failing to raise an MRE 403 objection. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## B. EVIDENCE OF SHOE INSOLE

Defendant argues that Detective Neher contaminated the shoe insole that Mitotyping tested when he removed it from the shoe, wrapped it in plastic, and brought it to a photography shop for photographing. However, to the extent that defendant argues the insole was degraded and that the trial court should have given the evidence little weight, the handling of the shoe went to the weight of the evidence not to its admissibility. See *People v White*, 208 Mich App 126, 132; 527 NW2d 34 (1994) (noting that "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility") (quotation marks and citation omitted). The trial court, as the trier of fact, was free to weigh the evidence in the manner that it deemed appropriate. See *Stevens*, 306 Mich App at 628.

In his Standard 4 brief, defendant argues that the trial court erred because the shoe and shoe insole were not properly authenticated and that Detective Neher's conduct violated protocols for handling the evidence.

MRE 901 governs authentication of evidence in Michigan, and it provides in relevant part that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). "Factors to be considered in making this determination include the nature of the article, the circumstances surrounding the preservation and custody of it, and the possibility of intermeddlers tampering with it." *People v Beamon*, 50 Mich App 395, 398; 213 NW2d 314 (1973). "If, after considering such factors, the trial judge is satisfied that in reasonable probability the article has not been changed in important respects, he may permit its introduction in evidence." *Id*. at 398-399.

The trial court did not err in finding that the prosecution introduced sufficient evidence to authenticate the shoe and the insole in accordance with MRE 901. The record showed that police stowed the shoe and the insole in a sealed paper bag before sending the shoe to the Michigan State Police Forensic Laboratory, and that after testing, the shoe and insole were returned to the police department. Detective Neher removed the insole from the shoe, wrapped the shoe insole in plastic, and returned the insole to the paper bag in plastic after taking photographs. Detective Neher testified that defendant's DNA samples were contained in separate plastic tubes. Thus, there was no evidence to show that the shoe insole was contaminated or tampered[8] with, and the trial court did not err as a matter of law in holding that the shoe and the shoe insole were properly authenticated. Accordingly, the trial court did not

---

[8] Defendant appears to argue that Detective Neher was not credible and that, contrary to his testimony, he tampered with the evidence. However, issues of credibility involve a factual determination and "[t]he trial court acts as the fact finder in determining questions of fact preliminary to the admissibility of evidence." *People v Burns*, 494 Mich 104, 117 n 39; 832 NW2d 738 (2013). Moreover, "the government need not prove a perfect chain of custody for evidence to be admitted at trial; gaps in the chain normally go to the weight of the evidence rather than its admissibility." *White*, 208 Mich App at 132 (quotation marks and citation omitted).

abuse its discretion in denying defendant's motion to suppress the evidence, and defendant is not entitled to relief. MRE 103(a)(1).[9]

## II. SUFFICIENCY OF THE EVIDENCE

We reject defendant's argument that there was insufficient evidence to support his convictions of armed robbery and felony-firearm. When reviewing an argument following a bench trial that insufficient evidence existed to prove the elements of the crimes, "this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Hutner*, 209 Mich App 280, 282; 530 NW2d 174 (1995). "Circumstantial evidence, and reasonable inferences arising from the evidence, may constitute satisfactory proof of the elements of the offense." *Id*. "[T]his Court should not interfere with the jury's role of determining the weight of the evidence or the credibility of witnesses." *People v Lee*, 243 Mich App 163, 167; 622 NW2d 71 (2000).

Defendant was convicted of armed robbery and felony-firearm. The elements necessary to prove armed robbery under MCL 750.529 are:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

"The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

There was sufficient evidence for the jury to convict defendant of both crimes. The victim testified that the perpetrator assaulted him with a gun at a Shell gas station in Muskegon and demanded money, thus perpetrating a larceny in the course of the assault. Defendant's guilt or innocence turned on the identity of the perpetrator, and sufficient evidence existed to show that defendant was the man who robbed the Shell gas station with a gun. Specifically, the robbery occurred at approximately 6:00 a.m. on July 14, 2014, and about two hours earlier that morning, a police officer observed defendant and Shawn Mayberry in Nunica, a short distance away. According to a witness, defendant was in the same vehicle that was later linked to the

---

[9] Defendant also argues that Detective Neher's conduct with respect to the shoe violated MCL 28.175 and MCL 750.483. However, neither of these statutes governs the admissibility of evidence.

robbery.  Additionally, a surveillance camera recorded the vehicle fleeing the crime scene.  This evidence supported that defendant participated in the robbery with Mayberry.

Other evidence showed that defendant was the man who robbed the gas station.  Police recovered a sweatshirt at defendant's residence that had markings on it that matched the markings on the sweatshirt that the perpetrator wore during the robbery.  Although the perpetrator's sweatshirt also had a drawstring, the trial court found that the drawstring could have been attached to another garment underneath the sweatshirt.  There was no evidence to counter the trial court's finding with respect to the sweatshirt.

In addition, police recovered Newport cigarettes at defendant's place of residence, which was the same brand of cigarettes that the perpetrator took during the robbery.  More significantly, police recovered text messages from defendant's phone that showed that he and Mayberry prepared for a robbery by discussing casing locations, stealing a license plate, and bringing guns on the day before the robbery.  In addition, in recorded telephone calls that defendant placed from jail, defendant discussed destroying or concealing items including an "iron" and shoes.  Police testified that "iron" is a slang term that is used for "gun."  See *People v Kowalski*, 489 Mich 488, 509 n 37; 803 NW2d 200 (2011) (attempts to conceal evidence are probative of consciousness of guilt).  Finally, an expert testified that there was a 1 in 100 billion chance that someone other than defendant contributed DNA to a shoe that the perpetrator left at the scene of the robbery.  On this record, there was sufficient evidence to prove all of the elements of armed robbery and felony-firearm.

### III.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that, in a variety of ways, he was denied the effective assistance of counsel.  None of his arguments have any merit.

Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law.  *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).  A trial court's findings of fact, if any, are reviewed for clear error, while constitutional issues are reviewed de novo.  *Id*. at 579.  In cases like this one where the trial court held an evidentiary hearing only to address certain assertions of ineffective assistance of counsel, this Court's review of the arguments on which there was no evidentiary hearing is limited to mistakes apparent on the record.  See *People v Hurst*, 205 Mich App 634, 641; 517 NW2d 858 (1994).

To establish ineffective assistance of counsel, a defendant must show that (1) counsel rendered assistance that "fell below an objective standard of reasonableness" under prevailing professional norms, and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *People v Toma*, 462 Mich 281, 302-303; 613 NW2d 694 (2000) (quotation marks and citation omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (quotation marks and citation omitted).  Furthermore, "[b]ecause the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim."  *Id*.

After trial, defendant moved for a new trial or a *Ginther*[10] hearing in part on the basis that trial counsel was ineffective for failing to pursue an alibi defense. After holding a *Ginther* hearing, at which trial counsel testified, the trial court held that trial counsel was not ineffective in failing to present an alibi defense. As explained below, the trial court did not err in that conclusion. At the *Ginther* hearing, trial counsel testified that he investigated the alibi defense and determined that it was not a viable strategy. Trial counsel contacted two of the three potential alibi witnesses, and could not locate the third. After contacting one of the potential alibi witnesses, counsel determined that the witness would not be helpful because she was unable to recall what time defendant allegedly arrived at the Seaway Motel, and she was not sure if Mayberry dropped off defendant at the motel after the robbery. Moreover, her linking defendant to the Seaway Motel, located near the scene of the robbery, would have placed defendant near the robbery. Trial counsel also contacted Mayberry, but Mayberry insisted that he was not in Muskegon on the morning of the robbery, which counsel considered problematic for the alibi defense because defendant stated that Mayberry dropped him off at a Muskegon hotel on the morning of the robbery.

Finally, trial counsel could not locate a third alibi witness, and defendant did not know where she was located. Trial counsel did not hire an investigator because there were no funds to do so and because he investigated the alibi defense and determined it was not reliable. Trial counsel testified that defendant agreed to let him drop the alibi defense. Based on this record, defendant has failed to show that the trial court erred in concluding that trial counsel was not deficient in declining to pursue the alibi defense. The facts support the finding that trial counsel thoroughly investigated the defense and made a strategic decision not to pursue the defense. Under these facts, trial counsel's decision was not a product of deficient performance. See *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002) ("Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy.").

We also reject defendant's argument that trial counsel was ineffective for failing to investigate defendant's cell phone records that purportedly show he was in Detroit at the time of the robbery, as it is not supported by any facts brought forth at the hearing. Rather, at the *Ginther* hearing, trial counsel testified that the prosecution provided defendant's cell phone records to the defense at the outset of the trial, and that defendant was informed why the records showed that his phone "pinged" off of a cell phone tower in Detroit. Trial counsel testified that he did not pursue the cell phone records as part of a defense because (1) defendant maintained that he drove to Grand Rapids on the morning of the robbery, and (2) defendant never mentioned having been in Detroit. On this record, the trial court did not err in finding that trial counsel made a strategic decision with respect to the cell phone records and that the decision did not amount to deficient performance. See *Davis*, 250 Mich App at 368.

---

[10] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Next, in his Standard 4 brief, defendant raises multiple assertions of ineffective assistance of counsel. Specifically, defendant argues that trial counsel was ineffective (1) for his handling of the DNA evidence, (2) because there were exculpatory e-mails that were not disclosed until after the trial, (3) because Dr. Buckleton's testimony should not have been admitted, and (4) because counsel's failure to disclose the e-mails denied defendant the opportunity to impeach Detective Neher and other witnesses. We reject each of these arguments.

At the outset, we note the important proposition that "[d]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *Davis*, 250 Mich App at 368. Defendant has failed to show that trial counsel's decisions on how to challenge the DNA evidence fell below an objective standard of reasonableness. Trial counsel objected to Dr. Buckleton's testimony, and as a result, the trial court held a *Daubert* hearing and trial counsel procured an expert witness, Dr. Reich, to testify that STRmix was not reliable. Trial counsel effectively examined Dr. Reich and vigorously challenged Dr. Buckleton's testimony. This performance did not come close to falling below an objective standard of reasonableness.

The prosecution's production (allegedly on the second day of trial) of an e-mail from Joel Schultze of the Michigan State Police Forensic Crime Laboratory also did not violate any of defendant's asserted rights. In the e-mail, Schultze indicated that the prosecution requested that the shoe be retested, to which Schultze responded, "[I]t is my opinion that the reanalysis wouldn't produce a single source DNA profile for comparison." Schultze also stated that "[i]f further analysis is still being requested, it would be classified as a reanalysis and approval would have to go through the proper channels." Defendant argues that the failure to disclose the e-mail amounted to a violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), ineffective assistance of counsel, and a violation of the Confrontation Clause. We reject each of these arguments.

"[T]he components of a 'true *Brady* violation,' are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). The e-mail from Schultze did not amount to material evidence that was favorable to the defense. At trial, a forensic scientist at the Michigan State Police Forensic Laboratory testified that although she took a forensic sample from the shoe and the sample contained four DNA donors, she could not perform a DNA interpretation. Thus, evidence that the Michigan State Police could not perform a DNA analysis was already admitted at trial. Defendant fails to show how evidence that the state police lab declined to perform reanalysis of the shoe was material or favorable to the defense in light of what was already presented through testimony. Accordingly, there was no *Brady* violation and trial counsel was not deficient in failing to discover the e-mail before the second day of trial.

Defendant argues, citing to trial counsel's cross-examination of Holland in which Holland was questioned regarding whether she was aware that the insole of the shoe had previously been tested, that the e-mail could have been used for impeachment purposes. But defendant fails to articulate how the e-mail or any information concerning the Michigan State Police's inability to reanalyze the shoe would have been relevant for impeachment purposes. Holland's testimony showed that previous testing would not have impacted her conclusions and,

moreover, Schultze indicated in his e-mail that reanalysis would likely not have produced a single-source profile.[11] Defendant has not shown that trial counsel's questioning of Holland was deficient under an objective standard of reasonableness or that he was denied the right to confront the witnesses against him. See *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008) ("The questioning of witnesses is presumed to be a matter of trial strategy."). For the same reasons, defendant has not established a violation of the Confrontation Clause, as he had the opportunity to confront and cross-examine the prosecution's witnesses at trial. See *People v Pesquera*, 244 Mich App 305, 309; 625 NW2d 407 (2001). The absence of the e-mail did not deprive defendant of this opportunity.[12]

Next, in his Standard 4 brief, defendant argues that his rights to procedural due process and the effective assistance of counsel were violated when the district court and the circuit court entered orders even though both courts did not have subject-matter jurisdiction. Defendant presents a host of incoherent arguments on each of these issues. He appears to contend that the prosecution failed to "certify" the charges into the record. Defendant also references "bonding" of the charges and cites federal law. To the extent that defendant is arguing that there was a violation of a federal procedural statute regarding bonds or otherwise, this argument lacks merit as federal procedural law does not govern in a state proceeding. In all other respects, defendant has failed to present cognizable arguments, and he abandoned review of the issues. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 627 (1998). Additionally, we reject any argument that the trial court lacked subject-matter jurisdiction or that trial counsel was ineffective for failing to object on that basis.

## IV. FAILURE TO STRIKE THE INFORMATION

In his Standard 4 brief defendant also argues that the trial court erred in failing to strike the information and in permitting the prosecution to amend the information.

"A trial court's decision to grant or deny a motion to amend an information is reviewed for an abuse of discretion." *People v McGee*, 258 Mich App 683, 686-687; 672 NW2d 191 (2003). "A trial court abuses its discretion when its decision falls outside the range of reasonable

---

[11] Of course, Holland did not need a single-source profile because Dr. Buckleton was able to analyze mixed source profiles using STRmix. As we have concluded, the STRmix results were properly admitted at trial.

[12] Defendant argues that there was inconsistency with respect to Detective Neher's testimony about the shoe insole. Even assuming that there was inconsistency with respect to whether the insole had previously been tested, defendant fails to articulate how this was relevant to the defense when Holland testified that previous testing would not have impacted her conclusions. Trial counsel was not deficient in cross-examining Detective Neher. "In any case, the government need not prove a perfect chain of custody for evidence to be admitted at trial; gaps in the chain normally go to the weight of the evidence rather than its admissibility." *White*, 208 Mich App at 132 (quotation marks and citation omitted).

and principled outcomes, or makes an error of law." *People v Swain*, 288 Mich App 609, 628-629; 794 NW2d 92 (2010) (citations omitted).

The trial court did not abuse its discretion in denying defendant's motion to strike the information or in permitting the prosecution to amend the information. Pursuant to MCR 6.112(H), the trial court had discretion to allow the prosecution to amend the information before, during, or after trial "unless the proposed amendment would unfairly surprise or prejudice the defendant." See *McGee*, 258 Mich App at 686, 689; see also MCL 767.76 (providing that a trial court has discretion to grant a motion to amend the information). Here, there was nothing in the amended or second amended information that amounted to unfair surprise or prejudice. The amended information removed Mayberry as a codefendant. Defendant cannot show that this amounted to unfair surprise or prejudice in that removal of the codefendant did not alter the defense that defendant advanced at trial. Similarly, the initial information put defendant on notice that the prosecution intended to seek a fourth-offense habitual offender enhancement. The first amended information simply notified defendant that this enhancement would result in a mandatory minimum 25-year sentence. The second amended information simply added a fourth previous conviction. This did not amount to unfair surprise in that the trial court could have inferred that defendant was aware of his own criminal record.

In addition, the substance of the information complied with the requirements of MCR 6.112(D). The information contained defendant's name, the citations to the charged offenses, and the penalties for the offenses. The included descriptions of the offenses were sufficient to "fairly apprise the accused and the court of the offense[s] charged." MCL 767.45(1)(a). In addition, the prosecutor signed the initial information and both amended versions of the information. Furthermore, the initial information contained a witness list; although the second amended information did not contain a witness list, this amounted to no more than harmless error; defendant was apprised of the potential witnesses and the prosecution filed a witness list such that defendant cannot show that failure to file a subsequent witness list amounted to prejudice. See MCR 6.112(G). Additionally, the trial court had discretion to permit the prosecution to file an amended information without Mayberry's name. See MCR 6.112(H).

Defendant also argues that after Mayberry was removed from the information, all reference to Mayberry should have been barred from the trial and the prosecution should have been required to produce Mayberry as a res gestae witness. These arguments lack merit. Mayberry's absence from the list of accomplices did not mean that the prosecution could not refer to Mayberry at trial. Reference to Mayberry was relevant and therefore admissible. See MRE 401. To the extent defendant argues that the prosecution was required to list Mayberry as a res gestae witness on the amended and second amended information, defendant is correct that the prosecution must attach a list of all known res gestae witnesses. See MCR 6.112(D). However, assuming that Mayberry was a res gestae witness, defendant has not shown that the prosecution's failure to include him on an attached list amounted to anything more than harmless error. See MCR 6.112(G). The defense was aware of Mayberry's potential involvement in the robbery from the outset of the case, as trial counsel testified at the *Ginther* hearing that he contacted Mayberry and that Mayberry insisted that he was not in Muskegon on the morning of the robbery. Thus, defendant was aware of Mayberry before trial, and Mayberry would not have offered favorable testimony for the defense. Accordingly, defendant was not prejudiced and he is not entitled to relief.

-14-

We likewise reject defendant's argument that Detective Neher offered false testimony at various points during the proceedings, including the preliminary examination and the bench trial. However, to the extent that defendant points out inconsistencies in Detective Neher's testimony, this involves an issue of witness credibility, and "[t]his Court will not interfere with the trier of fact's determinations regarding the weight of the evidence or the credibility of witnesses." *Stevens*, 306 Mich App at 628.

Finally, defendant also contends that fabricated evidence and false testimony of Detective Neher led to the issuance of the arrest warrant. Defendant appears to contend that because the arrest warrant was invalid, his convictions are void, and he requests a remand for a hearing on the evidence underlying the warrant. However, "a court's jurisdiction to try an accused person cannot be challenged on the ground that physical custody of the accused was obtained in an unlawful manner." *People v Burrill*, 391 Mich 124, 133; 214 NW2d 823 (1974). Indeed, "[t]here is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Id*. (quotation marks and citation omitted). Defendant has failed to show that he was denied a fair trial; accordingly, irrespective of whether there were errors associated with the warrant, defendant is not entitled to relief.[13]

Affirmed.

/s/ Christopher M. Murray
/s/ Thomas C. Cameron
/s/ Anica Letica

---

[13] We are unable to decipher defendant's other arguments related to the information, the warrant, and Detective Neher's testimony. Accordingly, such arguments are abandoned. See *Kelly*, 231 Mich App at 640-641 ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").