*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 27, 2021

Plaintiff-Appellee,

v

No. 350798
Oakland Circuit Court
LC No. 2019-269793-FC

CHARLES CLIFTON GHOLSTON,

Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and RIORDAN and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of armed robbery, MCL 750.529, and first-degree home invasion, MCL 750.110a. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, 30 years to 60 years' imprisonment each for his armed robbery and first-degree home invasion convictions. On appeal, defendant argues trial counsel was ineffective by failing to challenge the reliability of the DNA evidence. In addition, defendant argues (1) the trial court erred by failing to hold an evidentiary hearing, under *Franks v Delaware*, 438 US 154; 98 S Ct 2674; 57 L Ed2d 667 (1978), to test the sufficiency of the warrant affidavit, and (2) trial counsel was ineffective for failing to correct the trial court's misinterpretation of defendant's argument at the motion hearing. We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

This case arises from an armed robbery. Edward Bell and Constance Wells were married and resided in two abutting houses, referred to as apartment three and apartment four, with their children, including Bell's son 17-year-old son ME. Bell and ME had saved about $7,000 with which to purchase a vehicle, and they stored the money in apartment three. A few weeks before the robbery, Bell's nephew had put Bell in contact with Leroy Butram, who agreed to sell a vehicle to Bell for $10,000 with $7,000 owed up front and $3,000 to be paid sometime after the vehicle was delivered. Bell and Butram agreed to a delivery date of September 20, 2017.

On September 20, 2017, at about 6:00 p.m., ME was in apartment four getting ready to go to the local high-school football game. ME heard a knock at the door and as he opened the door, a man forced his way in, put a gun to ME's head, and ordered him to the ground, "askin' me where

-1-

everything was, like, if I had money." The robber addressed ME by his older brother's name, Elijah, demanded that ME disclose the location of the money, ordered ME on the ground, and threatened to "get mad and start shooting" if ME did not comply. ME believed the robber was serious about shooting, so he laid face down on the ground.

At the same time, Wells and her stepdaughter, NE, stopped at Bell's apartment. When they pulled into the driveway, NE got out of the car and went inside the apartment while Wells remained in the car. Inside the apartment, ME heard NE coming up the steps to the apartment. Scared for NE's safety, ME told the robber the money was in a bag near his clothes in his bedroom. While lying on the ground near the front door, ME tried to hold the door closed to prevent NE from entering but was unsuccessful. When NE entered, she saw ME "on his knees with his hand behind his back" with the robber a few feet away. The robber ordered her to get on the ground and demanded ME and NE "tell him where the rest of the money was or he was gonna' shoot." The robber then asked if there was anybody else outside, and NE said no to protect her mother. When the robber noticed Wells' car outside, he ordered ME to tie NE's hands with a computer cord. The robber then ran from the house with the bag of money, ME's backpack, and some jewelry.

Outside the apartment, Wells believed NE was taking longer than expected, and "after a while, the [apartment] door slammed open, and I saw an image [sic] run past, and then I heard [ME] sayin' mom, we got robbed[.]" As the robber ran away from the house, ME followed the robber and saw him get in the passenger side of a dark-colored car that looked like a Chrysler 300, from which ME obtained a partial license plate number. NE exited the house shortly thereafter and appeared visibly shaken. When responding Farmington Police Officer, Donald Laporte arrived, ME walked around the home and driveway with Officer Laporte and saw Bluetooth headphones and Apple watchbands in the street. ME identified the watchbands as items the robber had taken from the apartment. ME and NE identified the headphones as the headphones the robber was wearing during the incident. They explained that, throughout the incident, the robber was talking to someone on a cellphone using the headphones. ME identified the location of the watchbands and headphones as lying near the location where the robber had gotten into the getaway vehicle.

Bell, who was at work at the time of the incident, arrived at the apartment and identified the missing money and jewelry. Bell then called his nephew and told his nephew that he believed Butram was involved in the robbery. About fifteen minutes after the call, Butram called Bell and denied his involvement, but Butram "paused" and "kinda' stuttered afterwards" when Bell told Butram that the police had been called. Bell gave the police Butram's contact information, including his cellphone number. Bell also provided a cellphone number for Butram's father, Gunz,[1] and Bell's brother, Marcellus Bell.

Farmington Police Detective William Wood presented a photographic lineup, which did not include defendant, to NE and ME. ME stated he was 100% sure the robber was Darnell Randolph, his friend's stepfather, because the robber "was, like, big, like the dude's stepfather, and he was calling me Elijah, so—and Elijah knew the stepfather, too, so I just—I was pretty sure it was him[;]" and as a result, ME picked Randolph out of the photographic lineup. Randolph

---

[1] Gunz's first name was not identified in the lower court record.

became the original suspect, but he was excluded when it was confirmed that Randolph had been in Wisconsin at the time of the incident. NE looked at the photographic lineup more slowly and picked a person from the lineup but indicated she was not sure if that person was the robber. The person NE selected had no connection to the case.

During the investigation, Farmington Police Commander Justin DuLong obtained and executed search warrants for "tower dumps" from the major cellphone companies in the area to obtain information of all incoming and outgoing calls near the incident. The tower dump data revealed Butram made several calls and exchanged several text messages to two other telephone numbers using a cellphone tower at the Grand River Avenue and M-5 intersection (the Grand River cellphone tower) near the victims' home when the incident occurred. The telephone numbers belonged to Arthur Lee Knuckles and defendant. Defendant's cellphone was also in contact with Knuckles's cellphone at the time the incident occurred. As a result, DuLong began to suspect defendant's involvement, so he obtained a search warrant for more detailed cellphone use information regarding Butram, Knuckles, and defendant. The resulting data revealed Knuckles and defendant were in the Farmington area at the time of incident while they were contacting each other.[2] Oakland County Sheriff's Department Detective Edward Wagrowski created an animation showing the movement of defendant's cellphone from Detroit to Farmington during the time frame surrounding the incident. Specifically, defendant's and Knuckles's cellphones exchanged four calls between 5:56 p.m. and 6:07 p.m., with defendant's cellphone using the Grand River cellphone tower near the victims' home.

The headphones recovered from the incident scene were sent to the Michigan State Police crime laboratory for DNA testing. Michigan State Police forensic scientist, Erica Anderson, performed a DNA analysis on the headphones, finding the headphones had a "mixed profile" containing at least four DNA profiles. Anderson was able to conclude with additional analysis that there was one major DNA contributor to the headphones and three minor DNA contributors. Anderson explained that she could only extract a usable DNA profile from the major DNA contributor, so she entered that profile into the Combined DNA Index System (CODIS), which would automatically search for a match to any other person known to the system. Michigan State Police forensic scientist, Joshua Strong, explained that there was a "hit" in CODIS from the profile Anderson had entered, showing a match to defendant. Long then re-tested the DNA profile the laboratory had on file from defendant to confirm the correctness of the CODIS match. Long wrote a report requesting that a new DNA sample should be obtained from defendant and compared by a third scientist to the sample obtained from the headphones. DuLong obtained and executed a search warrant to collect a buccal swab sample from defendant for additional testing.

Michigan State Police laboratory manager, Heather Vitta, then conducted a further DNA analysis to confirm the results. To do so, Vitta utilized a software program called STR Mix, which "helps us kinda' decipher the mixture, and determine who a likely [DNA] contributor is to the mixture." Vitta explained:

---

[2] The data also confirmed three telephone numbers that belonged to defendant, Knuckles, and Butram, respectively. When contacted by DuLong, Butram agreed to come to the police station for an interview but never showed up, and Knuckles refused to talk to DuLong.

The [STR] Mix software analysis determined that there were four contributors, and it gave [Vitta] percent contributions for those four contributors. . . . It estimated the primary or major contributor at 66 percent. The secondary was at 18 percent. The third contributor was at 10 percent. And the final was at six percent.

* * *

[The software is] very objective, and it's based on a lot of math and—and, you know, how often we see certain DNA types in the population, and so it takes all of that into account when it does this calculation.

Because the major DNA contributor to the headphone DNA sample had a vast amount of DNA present, as compared to the minor contributors, only the major DNA contributor had sufficient DNA present to identify the contributor. The STR Mix analysis "determined that it was at least 330 nonillion[3] times more likely" than not that defendant was one of the four DNA contributors.

In September 2018, DuLong had NE look at a second photographic lineup conducted by Farmington Police Sergeant Patrick Spelman, who had been uninvolved in the investigation. NE looked at six photographs, without names, and picked defendant. Sergeant Spelman opined that NE picked defendant "[r]ather quickly." At the time of the photographic lineup, NE told Sergeant Spelman that she was 80% sure the robber was defendant. At trial, NE testified that she was 100% sure defendant was the robber after seeing him in person in the courtroom.

Relevant to this appeal, defendant moved to request an evidentiary hearing under *Franks*. Defendant challenged the sufficiency of DeLong's search warrant for detailed call information associated with a cellphone number registered to defendant. Defendant argued that the affidavit in support of the warrant was improper for two major reasons. First, defendant contended that DuLong failed to describe the specific location of the subject phone. Secondly, the affidavit stated that a black Dodge Charger with a particular license plate number was registered to defendant, and "the victim reported that the suspect fled the scene in either a black Dodge Charger or Chrysler 300." Defendant contended that he never owned a black Dodge Charger, and although he had owned a Dodge Charger, that vehicle had been stolen approximately eight months before the robbery. The trial court denied defendant's motion, finding no information that DuLong "knew the vehicle wasn't in [d]efendant's possession, but nevertheless went forward anyway with that knowledge[.]" The trial court concluded there were no affidavits or sworn statements to support defendant's assertion that DuLong's failure to discover defendant's stolen vehicle was beyond mere negligence or innocent mistake.

Defendant was convicted as described. This appeal followed.

---

[3] A nonillion is 1,000,000,000,000,000,000,000,000,000,000.

## II.  DENIAL OF *FRANKS* HEARING

We first address defendant's challenge to the trial court's denial of his motion for a *Franks* hearing.

### A.  STANDARDS OF REVIEW AND APPLICABLE LAW

A "*Franks* hearing" is an evidentiary hearing, pursuant to *Franks v Delaware*, 438 US 154; 98 S Ct 2674; 57 L Ed 2d 667 (1978), inquiring into the validity of a search warrant's affidavit. See *People v Martin*, 271 Mich App 280, 309; 721 NW2d 815 (2006).  The trial court's decision whether to hold a *Franks* hearing is discretionary, but the trial court's underlying factual findings are reviewed for clear error, and any application of those facts to the law is reviewed de novo.  *Id*. at 309-310.  "An abuse of discretion occurs when a trial court's decision falls outside the range of reasonable and principled outcomes."  *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation omitted).  "A trial court's factual finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that the trial court made a mistake."  *Id*. (quotation omitted).

An affidavit supporting a search warrant may be challenged upon " 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause.' "  *Martin*, 271 Mich App at 311, quoting *Franks*, 438 US at 155-156.  "The rule from *Franks* is also applicable to material omissions from affidavits."  *Martin*, 271 Mich App at 311.  A challenge to the validity of the affidavit requires deliberate falsity or reckless disregard by the affiant, and "[a]llegations of negligence or innocent mistake are insufficient."  *Franks*, 438 US at 171.  Consequently, the fact that a statement in an affidavit is incorrect will not, by itself, undermine the validity of that portion of the affidavit.  "The defendant has the burden of showing, by a preponderance of the evidence, that the affiant knowingly and intentionally, or with a reckless disregard for the truth, inserted false material into the affidavit and that the false material was necessary to the finding of probable cause."  *People v Ulman*, 244 Mich App 500, 510; 625 NW2d 429 (2001).  A magistrate's finding of the sufficiency of an affidavit should generally be afforded considerable deference.  *Franklin*, 500 Mich at 101.  "The invalid portions of an affidavit may be severed, and the validity of the resultant warrant may be tested by the information remaining in the affidavit."  *Ulman*, 244 Mich App at 510.

### B.  ANALYSIS

Defendant argues the trial court misunderstood his argument at the motion hearing and erroneously denied his motion for a *Franks* hearing based on that misunderstanding.  Specifically, defendant maintains the trial court failed to recognize and address the evidence that DuLong recklessly or deliberately made a false statement that defendant owned a black Dodge Charger in the warrant affidavit.  As noted, the affidavit stated that a black Dodge Charger with a certain license plate number was registered to defendant.  That averment turned out to be incorrect: the stated license plate number was actually registered to defendant's *white* Dodge Charger.  Nevertheless, under the circumstances, this mistake does not rise to the level of a deliberate falsehood or reckless disregard of the truth.  *Franks*, 438 US at 171-172.

First, defendant contends that there was no evidence he did actually own a black Dodge Charger. However, DuLong's investigation with the Secretary of State revealed that defendant did in fact own a black Dodge Charger and received at least one traffic ticket with the vehicle in 2016. Therefore, defendant is incorrect: there was evidence that he owned a black Dodge Charger. Secondly, defendant provided no evidence in support of his assertion that his white Dodge Charger had been stolen, nor did he provide any evidence that it remained missing at the time of the robbery. More importantly, however, presuming the truth of his assertions, there is no indication that DuLong knew or should have known that the white Dodge Charger had been stolen. DuLong testified that his records search revealed that defendant had been issued traffic tickets in two separate Dodge Chargers, one white and one black, but found no stolen vehicle report. In summary, defendant has established an error in the affidavit, but he has provided nothing to suggest that the error was anything other than innocent, or at worst negligent.

Even presuming DuLong's reference to the black Dodge Charger should have been excluded from the warrant affidavit, the search warrant would remain supported by probable cause to obtain defendant's cellphone records. A review of the record indicates that DuLong's basis for obtaining the tower dumps and detailed cellphone records arose from NE's and ME's testimony that the robber was talking on a cellphone throughout the incident. Additionally, Butram's cellphone number, given to DuLong by Bell, ultimately led to the discovery of defendant's connection to the incident. The reference to the Dodge Charger was essentially secondary, and indeed fairly weak on its face given its statement that the robber's getaway vehicle might have been a different model vehicle altogether. On this basis, we conclude that DuLong had sufficient probable cause to obtain defendant's cellphone records without the single provision in the warrant affidavit referencing defendant's vehicle.

Defendant alternatively contends that he received ineffective assistance of counsel, partly on the ground that trial counsel failed to correct the trial court's misunderstanding as to defendant's vehicles at the motion hearing. We will discuss this alternative argument below.

### III. EFFECTIVE ASSISTANCE OF COUNSEL

As noted, defendant contends that he received ineffective assistance of counsel because counsel failed to correct the trial court's misunderstanding of his argument seeking a *Franks* hearing. Defendant additionally contends that he received ineffective assistance of counsel because counsel failed to challenge the reliability of the STR Mix software evidence. We disagree.

### A. STANDARD OF REVIEW

"Effective assistance of counsel is presumed," and "defendant bears a heavy burden of proving otherwise." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). To establish ineffective assistance of counsel, "a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that the representation so prejudiced the defendant as to deprive him of a fair trial." *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). To establish prejudice, "defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result [of the trial] would have been different." *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996). Defendant "must overcome the strong presumption that

his counsel's action[s] constituted sound trial strategy under the circumstances." *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

Generally, the determination of whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). However, defendant did not preserve his claim of ineffective assistance of counsel by seeking a new trial or an evidentiary hearing in the trial court, *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000), or by filing a motion in this Court to remand. *People v Abcumby-Blair*, ___ Mich App ___, ___: ___ NW2d ___ (2020) (Docket No. 347369); slip op at 8. Therefore, this Court's "review is limited to errors apparent on the record." *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008). Although we may and must consider any materials provided for the purpose of determining whether it might be proper to remand for an evidentiary hearing, *People v Moore*, 493 Mich 933, 933; 82 NW2d 580 (2013), no need to do so is apparent from our review.

## B. DNA EVIDENCE

"MRE 702 establishes prerequisites for the admission of expert witness testimony." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). Before admitting expert testimony, the trial court must establish, in relevant part, that the testimony "is based on reliable data, principles, and methodologies that are applied reliably to the facts of the case." *Id*. at 120. "Some factors that bear on the trial court's inquiry include: (1) whether the scientific knowledge or technique can, and has been, tested, (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) 'the known or potential rate of error,' (4) 'the existence and maintenance of standards controlling the technique's operation,' and (5) whether there is 'general acceptance' of the scientific technique." *People v Muhammad*, 326 Mich App 40, 51-52; 931 NW2d 20 (2018), quoting *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 593-594; 113 S Ct 2786; 125 L Ed2d 469 (1993). However, "the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Muhammad*, 326 Mich App at 52 (quotation marks and citation omitted). "In other words, [t]he inquiry is not into whether an expert's opinion is necessarily correct or universally accepted, it is into whether the opinion is rationally derived from a sound foundation." *Id*. (quotation marks and citation omitted).

Defendant argues that the STR Mix software constituted an unreliable methodology when the DNA sample contained four contributors. This Court has already determined that STR Mix satisfies the *Daubert* factors of testability, peer review, a known low error rate, standards controlling its operation, and general acceptance in the scientific community. *Muhammad*, 326 Mich App at 53-58. Similarly, the Sixth Circuit[4] recently concluded that STR Mix satisfied the *Daubert* factors of testability, peer review, a low error rate and standards for ensuring a low error rate, and general acceptance in the scientific community, leading to widespread admissibility into evidence by various courts. *United States v Gissantaner*, 990 F 3d 457, 463-467 (CA 6, 2021). Defendant contends that although STR Mix may be admissible under some circumstances, it has

---

[4] Although this Court is not bound by decisions of any federal courts of appeal, federal court decisions may be persuasive. *People v Bosca*, 310 Mich App 1, 76 n 25; 871 NW2d 307 (2015).

not been established as reliable when there are four contributors to a DNA sample. Although most of the *Muhammad* analysis applies irrespective of the number of donors, defendant correctly notes that there were only two DNA donors in that case. *Muhammad*, 326 Mich App at 51, 55. Conversely, there were three contributors in *Gissantaner*. *Gissantaner*, 990 F 3d at 462. Nevertheless, it is unnecessary to repeat the thorough analyses conducted by the *Muhammad* and *Gissantaner* courts; clearly, the reliability of STR Mix as a principle and methodology has been well-established.

It appears that defendant conflates the reliability of STR Mix as a principle and methodology with the separate question of whether STR Mix was reliably applied in this particular case. See *Gissantaner*, 990 F 3d at 467-468. Defendant points out that even in a case that accepted STR Mix as a reliable principle and method in the abstract, the court rejected the application of STR Mix where there were four presumed contributors to a DNA sample. *United States v Lewis*, 442 F Supp 3d 1122, 1156-1160 (D Minn, 2020). However, the *Lewis* court only partially rejected the STR Mix evidence, largely because the specific lab that performed the testing did not have the computational resources to analyze five or more contributors and was suspected to underestimate the number of total contributors. *Id*. at 1156-1157. Critically, the *Lewis* court only found that limitation to undermine the ability of STR Mix to exclude persons as possible DNA donors; the court admitted the STR Mix evidence to the extent it showed the defendant to be the major DNA contributor. *Id*. at 1156-1160. Thus, defendant is correct in asserting that STR Mix may be unreliable as applied under some circumstances, but not under the kind of circumstances at issue in this case.

As discussed, Anderson's initial DNA analysis of the headphones revealed at least four DNA profiles. Vitta testified that the Michigan State Police crime laboratory is hampered by the same computational limitations as was the laboratory in *Lewis*. This would impliedly cast doubt on the reliability of STR Mix to exclude any particular person from having contributed to the mix. However, that was not the purpose of the STR Mix evidence here. Rather, the purpose was to confirm what Anderson and Long had already determined: that defendant was *a* contributor to the DNA on the headphones. Vitta's testimony made it clear that the only conclusion STR Mix could draw was that it was vanishingly unlikely defendant had *not* been *one of* the DNA contributors. Anderson had already determined that there was only one major contributor to the DNA sample, which CODIS and Long confirmed was a match to defendant. Ultimately, the significance was not to try to determine whether someone else might have handled the headphones, but only whether they were linked to defendant.

Because case law clearly establishes the reliability of STR Mix as a tool of inclusion, certainly as to a major donor even where there might be more DNA donors than the processing laboratory can calculate, any objection by trial counsel would have been futile. This Court will not find trial counsel to be ineffective where an objection would have been futile. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004). Furthermore, even if defendant had objected and obtained exclusion of the STR Mix evidence, the jury would still have been informed of the independent finding that defendant was the only major DNA donor on the headphones. Consequently, in combination with the extensive other evidence identifying defendant and linking him to both the headphones and the robbery, it is highly unlikely that exclusion of the STR Mix evidence would have affected the outcome of the trial. *Johnson*, 451 Mich at 124. Trial counsel

was not ineffective for failing to raise an objection that would have been futile and would have had little, if any, meaningful effect.

## C. *FRANKS* ARGUMENT CLARIFICATION

Finally, we also conclude that defendant was not denied effective assistance of counsel for trial counsel's failure to clarify the trial court's understanding of defendant's argument at the *Franks* motion hearing. A review of the record indicates that trial counsel's strategy was to focus on establishing DuLong's failure to discover the stolen vehicle report as a false and deliberate statement in the warrant affidavit. Even to the extent trial counsel failed to distinguish the white and black Dodge Chargers for the trial court's understanding, defendant fails to establish that it constituted ineffective assistance of counsel. As noted, defendant's assertion that he did not own a black Dodge Charger at the time of the incident is simply untrue and unsupported. Again, defendant was not denied effective assistance of counsel by counsel's failure to assert a meritless argument.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael J. Riordan
/s/ Colleen A. O'Brien