*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

WILLIAM MARK WARREN, II,

Defendant-Appellant.

UNPUBLISHED
May 16, 2019

No. 335934
Macomb Circuit Court
LC No. 2015-004047-FC

Before: MURRAY, C.J., and JANSEN and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). He was sentenced to life in prison without parole for the felony-murder conviction, and 225 months to 40 years in prison for the first-degree child abuse conviction. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

This case arises out of the death of 18-month-old AC. At the time of his death on August 13, 2015, AC lived in an apartment with his mother Brandee Wright, Brandee's friend and roommate Tiarha Burnett, Brandee's boyfriend defendant, and defendant's sister, Dajanique Harrison-Beckham. Defendant had moved into the apartment around July of that year after he and Brandee started dating, and his then four-year-old daughter AP sometimes also spent the night. Defendant often watched AC while Brandee worked or ran errands.

Brandee noticed injuries to AC's face and genitals in late July, and a burn to his finger at the beginning of August, but continued to allow defendant to babysit. AC stayed with his father Gharian Carver from August 8, 2015, until approximately 8:30 p.m. or 9:00 p.m. on August 10, 2015, when Gharian returned him to Brandee's apartment. Neither Brandee nor Tiarha noticed any additional injuries to AC's body, and he played with Tiarha's little sisters, took a bath, and ate dinner.

Defendant, Brandee, AC and AP all slept in the same bedroom that night, and defendant awoke early on the morning of August 11, 2015, to take Dajanique to work before returning to

-1-

the apartment. He then stayed in the bedroom with AC and AP while Brandee ran errands later that morning. When Brandee returned, AC was lying in bed facing the wall, and she noticed he was struggling to breathe. She and defendant rushed AC to McLaren Macomb Hospital, before he was transferred to Children's Hospital, where he later died on August 13, 2015.

While defendant was charged with felony murder and first-degree child abuse, Brandee pleaded guilty to involuntary manslaughter, child abuse, and lying to a police officer. At trial, AP testified that although she did not see anything, she knew defendant had been the one to hurt AC on the morning of August 11, 2015. She was in the bedroom with defendant and AC when she heard a "thump, thump, thump," and believed defendant had punched AC in the nose.

The testimony of Dr. Daniel Spitz, the Macomb County Medical Examiner, and Dr. Marcus DeGraw, a child abuse pediatrician, was consistent with AP's testimony that AC suffered intentional abuse. Dr. Spitz identified multiple areas of bruising on ACs body, focusing largely on a bruise to the back of AC's head, and concluded that AC's death was the result of blunt head injury consistent with child abuse and could not have been caused by an alleged minor fall into a plastic storage tote the night before. Likewise, Dr. DeGraw opined that AC died from blunt head trauma caused by physical abuse.

On the basis of the above testimony, defendant was convicted of felony murder and first-degree child abuse, and sentenced by the trial court. With his claim of appeal to this Court, defendant filed a motion for remand, asserting that he was entitled to a new trial or a *Ginther*[1] hearing because his trial counsel was ineffective for failing to fully investigate and call an expert medical witness at trial, and for failing to request the accomplice jury instructions at M Crim JI 5.4 and 5.6. In support of the motion, defendant attached an affidavit and a supplemental affidavit from Dr. Douglas Smith, in which Dr. Smith states that the testimony of Drs. Spitz and DeGraw was misleading, that AC's injuries were consistent with a fall described as happening the night before or some event occurring in Gharian's care, and that the "bruise" to the back of AC's head was actually a bedsore. This Court granted defendant's motion, and remanded for an evidentiary hearing to address defendant's ineffective assistance arguments. *People v Warren*, unpublished order of the Court of Appeals, entered November 29, 2017 (Docket No. 335934). Defendant's appellate counsel then filed a motion for a new trial in the trial court on the same bases.

The trial court held the *Ginther* hearing over three days, and heard testimony from Dr. Smith, Dr. DeGraw, Dr. Spitz, and defendant's trial counsel Thomas Tomko. Dr. Smith earned his medical degree and a PhD in experimental pathology, but retired in 2009 and does not maintain his medical license. He testified that he began reviewing abusive head trauma cases in 2014, but has never been a forensic pathologist or a child abuse pediatrician. Nor does he generally serve as an expert witness in the cases he reviews.

Dr. Smith stated that he first learned of AC's case when Tomko contacted him in February 2016. He requested additional medical records from Tomko, and believed he would

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

serve as a consultant in the case in accordance with his normal practice—by reviewing the records and identifying and suggesting relevant experts. He never suggested to Tomko that he himself would serve as an expert witness at trial, and generally referred such cases to Dr. Dragovic. However, according to Dr. Smith, Tomko never provided the additional records nor otherwise followed up.

From his review of medical records received after defendant's convictions, Dr. Smith believed that the mark on the back of AC's head, which Drs. Spitz and DeGraw relied on to inform their ultimate opinions regarding the cause and manner of AC's death, was actually a bedsore AC suffered while being kept alive for organ donation, rather than a bruise. Therefore, in his opinion, although AC's death was caused by blunt force trauma, the back of AC's head was not a site of impact. And in contrast to Drs. Spitz and DeGraw, he opined that such an injury could have been caused by an accidental fall.

Tomko testified that he requested, and the trial court granted, his motion for expert witness funds. He then looked through an "expert bank" in which he found Dr. Smith's name, and reached out. Tomko knew that Dr. Smith himself could not serve as an expert, so he contacted Dr. Dragovic, whom Dr. Smith recommended. According to Tomko, Dr. Dragovic expressed a willingness to review the case, and was provided copies of the documents needed to do so, but never ultimately provided an opinion.

When asked if anything Dr. Dragovic said led to his decision not to call an expert witness in the case, Tomko said no—that it was actually a matter of trial strategy based on the defense theory that Brandee, not defendant, had harmed AC when with him earlier in the morning on August 11, 2015, and on the fact that all experts, including Drs. Smith and Dragovic, agreed that AC died from blunt head trauma. Thus, according to Tomko, no further explanation was needed with regard to how AC died. Additionally, he testified that testimony regarding the potential for a lucid interval between head trauma and the manifestation of injuries was unnecessary because the defense had already decided against advancing at trial the theory that AC's injuries had happened the night before or while in Gharian's care.

Ultimately, the trial court denied defendant's motion for a new trial, holding that Tomko conducted an adequate investigation by consulting two medical experts, who both concluded that AC died from blunt head trauma, and that even if he had performed ineffectively, defendant failed to demonstrate prejudice in light of the prosecution's circumstantial evidence regarding the timeline of events, and the testimony of AP, Dr. Spitz, and Dr. DeGraw. Further, the court held that defendant's ineffective assistance of counsel argument with regard to the accomplice instructions also lacked merit.

## II. ANALYSIS

We hold that the trial court did not err when it denied defendant's motion for a new trial. We note first that defendant waived for appellate review his argument that the trial court's failure to provide the accomplice jury instructions deprived him of a fair trial. "A defendant waives an issue by expressly approving of the trial court's action. When the trial court asks the party whether it has any objections to the jury instructions and the party responds negatively, it is an affirmative approval of the trial court's instructions." *People v Miller*, 326 Mich App 40, 63;

___ NW2d ___ (2019) (citations omitted). Tomko not only failed to request the accomplice instructions before deliberation, but expressly approved of the instructions as given by the trial court. Thus, we will consider only defendant's ineffective assistance of counsel arguments.

"Whether defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law." *People v Muhammad*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 338300); slip op at 10. "A trial court's findings of fact, if any, are reviewed for clear error, while constitutional issues are reviewed de novo." *Id*.

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel rendered assistance that fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]" *Id*. (quotation marks and citation omitted; alteration in original). "Furthermore, [b]ecause the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *Id*. (quotation marks and citation omitted; alteration in original).

A. EXPERT WITNESS

Defendant asserts first that his trial counsel provided ineffective assistance by failing to adequately investigate and present an expert medical witness to refute the testimony of the prosecution's medical experts. For the reasons that follow, albeit different than those set forth by the trial court, we hold that the trial court did not err in its ultimate conclusion that defendant was not entitled to a new trial.

Generally, "[a]n attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy," and "[a] defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). The failure to call an expert witness rises to the level of ineffective assistance of counsel only when it deprives the defendant of a substantial defense. *Id*. "Courts must determine whether the strategic choices [were] made after less than complete investigation, or if a reasonable decision [made] particular investigations unnecessary." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted; alterations in original). However, " '[w]e will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence.' " *Payne*, 285 Mich App at 190, quoting *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008).

In *Ackley*, the Supreme Court considered a similar ineffective assistance of counsel argument under circumstances nearly identical to those at issue here. There, the defense counsel failed to present an expert medical witness at a trial involving "the unexplained and unwitnessed death of a child[.]" *Ackley*, 497 Mich at 383. At the *Ginther* hearing, he testified that he contacted a forensic pathologist who was unable to provide the opinion the defense wanted, but never contacted the additional expert the first forensic pathologist suggested may have an opinion favorable to the defense. *Id*. at 385-386. Ultimately, the Supreme Court held both that the defense counsel's performance fell below an objective standard of reasonableness because he

-4-

failed "to investigate and attempt to secure an expert witness who could . . . testify in support of the defendant's theory that the child's injuries were caused by an accidental fall," *id*. at 389, and that but for counsel's deficient performance, the outcome of trial would have been different, *id*. at 394. In so doing, the Court reasoned that no objectively reasonable explanation existed for the defense counsel's decision, as expert testimony was critical to counter the prosecution's evidence that the child suffered intentional abuse, and that the advice to contact a second expert was well founded, as evidenced by the affidavit, admitted at the *Ginther* hearing, of a forensic pathologist who stated that he would have testified the child's injuries had likely been caused by an accidental mild impact. *Id*. at 389-397.

Under *Ackley*, the combination of trial counsel's decision not to more thoroughly investigate Dr. Dragovic's ultimate opinion of the case, follow up with Dr. Smith regarding his own opinions, or further pursue an expert medical witness favorable to the defense, constituted an objectively unreasonable performance. Dr. Smith testified that he asked Tomko for additional documents to aid him in forming an opinion regarding AC's death, but never heard from Tomko again, and that he could have tried to connect Tomko with an expert that shared his opinions. And although Tomko recognized that testimony that AC's injuries may have been caused by an accidental fall, that he could have been lucid for a period of time following his injuries, and that the mark on the back of his head was a bedsore, rather than a bruise, would have supported defendant's claim of innocence, he affirmatively chose not to call Dr. Dragovic to testify at trial, or to pursue any additional medical experts.

Further, Tomko's proffered reason for not calling an expert witness demonstrates his limited knowledge of the varying professional opinions regarding blunt head trauma and was inconsistent with the actual defense presented at trial. When asked why, as a matter of trial strategy, he chose not to present an expert witness, Tomko said that Drs. Smith and Dragovic agreed with the prosecution's witnesses that AC died from blunt head trauma, and that he chose to focus at trial on the time Brandee spent alone with AC the morning of August 11, rather than the alleged fall into a plastic tote the night before. However, had he followed up with Dr. Smith, he may have learned that although Dr. Smith believed AC died from blunt head trauma, he also believed that trauma to be accidental. Moreover, Tomko's questions to witnesses at trial were in fact focused largely on AC's alleged fall into a plastic tote on the night of August 10. He asked Tiarha and Dajanique if they witnessed the fall, re-called Brandee to describe the incident, and asked both Dr. Spitz and Dr. DeGraw if they believed AC's injuries could have resulted from such a fall.

Nevertheless, defendant failed to demonstrate that but for his trial counsel's deficient performance, there is a reasonable probability that the outcome of his trial would have been different. As noted above, the defendant in *Ackley* produced, in support of his motion for a new trial, the affidavit of a forensic pathologist who said he would have testified consistent with the defendant's theory of the case. Here, defendant and his appellate counsel produced only the affidavits and testimony of Dr. Smith, who admitted, throughout the *Ginther* hearing, that he is not a forensic pathologist, serves generally as a consultant on abusive head trauma cases, connecting defendants with qualified experts, and intended to (and did) act in that same capacity on behalf of Tomko and defendant. Defendant provided no indication that a qualified expert even exists that shares a medical opinion consistent with his theory of defense or with Dr. Smith, or that such an expert would have testified on his behalf. Accordingly, on the record before us,

we hold that defendant failed to establish the factual predicate for his assertion that but for counsel's deficient performance, there is a reasonable probability that the outcome of his trial would have been different. See *Payne*, 285 Mich App at 190 (rejecting the defendant's ineffective assistance argument because the defendant merely speculated that an independent expert could have provided favorable testimony).

## B. ACCOMPLICE JURY INSTRUCTIONS

The trial court also did not err when it rejected defendant's assertion that Tomko performed deficiently for failing to request the accomplice instructions set forth in M Crim JI 5.4 and 5.6. "A criminal defendant is entitled to have a properly instructed jury consider the evidence against [him]," *People v Thorne*, 322 Mich App 340, 347; 912 NW2d 560 (2017) (quotation marks and citation omitted), and "[w]hen a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction," *id*. at 348 (quotation marks and citation omitted).

M Crim JI 5.4 provides:

(1) [*Name witness*] says [he / she] took part in the crime that the defendant is charged with committing.

*[Choose as many of the following as apply:]*

[(a) (*Name witness*) has already been convicted of charges arising out of the commission of that crime.]

[(b) The evidence clearly shows that (*name witness*) is guilty of the same crime the defendant is charged with.]

[(c) (*Name witness*) has been promised that (he / she) will not be prosecuted for the crime the defendant is charged with committing based upon any information derived directly or indirectly from the witness's truthful testimony. The witness may be prosecuted if the prosecution obtains additional, independent evidence against the witness.]

[(d) (*Name witness*) has been promised that (he / she) will not be prosecuted for the crime the defendant is charged with committing.]

(2) Such a witness is called an accomplice.

M Crim JI 5.6 provides:

(1) You should examine an accomplice's testimony closely and be very careful about accepting it.

(2) You may think about whether the accomplice's testimony is supported by other evidence, because then it may be more reliable. However, there is nothing wrong with the prosecutor's using an accomplice as a witness. You may

convict the defendant based only on an accomplice's testimony if you believe the testimony and it proves the defendant's guilt beyond a reasonable doubt.

(3) When you decide whether you believe an accomplice, consider the following:

(a) Was the accomplice's testimony falsely slanted to make the defendant seem guilty because of the accomplice's own interests, biases, or for some other reason?

(b) Has the accomplice been offered a reward or been promised anything that might lead [him / her] to give false testimony? *[State what the evidence has shown. Enumerate or define reward.]*

(c) Has the accomplice been promised that [he / she] will not be prosecuted, or promised a lighter sentence or allowed to plead guilty to a less serious charge? If so, could this have influenced [his / her] testimony?

[(d) Does the accomplice have a criminal record?]

(4) In general, you should consider an accomplice's testimony more cautiously than you would that of an ordinary witness. You should be sure you have examined it closely before you base a conviction on it.

An accomplice is defined as a "person who knowingly and willingly helps or cooperates with someone else in committing a crime." M Crim JI 5.5(2); *People v Allen*, 201 Mich App 98, 105; 505 NW2d 869 (1993).

It could not be reasonably argued that the accomplice instructions would have been appropriate here. Although Brandee pleaded guilty to charges arising out of the same crime for which defendant was charged, Brandee was charged under the theory that she failed to protect AC from defendant, not that she knowingly and willingly cooperated with defendant in committing the crime. Additionally, Tomko testified that he declined to request the instructions as a matter of trial strategy—he did not want defendant and Brandee to be viewed as accomplices because he wanted the jury to believe that Brandee alone murdered AC—and Brandee's potential credibility issues were readily apparent to the jury. See *People v Young*, 472 Mich 130, 139-140; 693 NW2d 801 (2005) (adopting the principle that reversal is not required for failure to provide the accomplice jury instructions where the witness's credibility problems have been plainly presented to the jury by other means). Tomko thoroughly cross-examined Brandee, Tiarha, and Detective Bishop, the officer in charge of the case, regarding Brandee's ulterior motives and inconsistent explanations for AC's injuries leading up to his death, and emphasized her credibility issues throughout his opening statement and closing argument. Additionally, the trial court instructed the jury on how to evaluate witness credibility, and "we presume juries follow their instructions." *People v Bruner*, 501 Mich 220, 228; 912 NW2d 514 (2018). Accordingly, defendant failed to demonstrate either that his trial counsel's performance fell below an objective standard of reasonableness for failing to request the accomplice instructions, or that but for his performance, a different result would have been reasonably probable.

Affirmed.

/s/ Christopher M. Murray
/s/ Kathleen Jansen
/s/ Michael J. Riordan