*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARIUS ANTHONY HINES,

        Defendant-Appellant.

FOR PUBLICATION
January 16, 2025
10:53 AM

No. 363151
Monroe Circuit Court
LC No. 2021-246321-FH

Before: MALDONADO, P.J., and PATEL and N. P. HOOD, JJ.

N. P. HOOD, J.

Defendant, Darius Anthony Hines, appeals as of right his jury trial convictions of possession with intent to deliver methamphetamine, MCL 333.7401(2)(b)(*i*), second or subsequent offense, MCL 333.7413(1) (Count 1); possession with intent to deliver less than 50 grams of fentanyl, MCL 333.7401(2)(a)(*iv*), second or subsequent offense, MCL 333.7413(1) (Count 2); and possession of an imitation controlled substance with intent to distribute, MCL 333.7341(3), second or subsequent offense, MCL 333.7413(1) (Count 6). The trial court sentenced Hines as a fourth-offense habitual offender, MCL 769.12, to 120 to 480 months' (10 to 40 years) imprisonment for the methamphetamine conviction, 114 to 480 months' (9½ to 40 years) imprisonment for the fentanyl conviction, and 32 to 48 months' (2⅔ to 4 years) imprisonment for the imitation-controlled-substance conviction. The trial court amended the judgment to provide that Hines's sentences were to run concurrent to each other but consecutive to his parole and sentences in another case (Monroe Circuit Court case number 20-245722-FH).

On appeal, Hines challenges a warrantless search of his residence, the admission of purportedly impermissible drug-profile testimony, and numerous sentencing issues. We find no reversible error related to the evidentiary issues, so we affirm Hines's convictions. But we vacate Hines's sentence and remand in order for the trial court to make specific findings regarding the extent to and manner in which OV 19 applies, to articulate its reasoning for imposing discretionary consecutive sentences, and to resentence Hines in light of our conclusion that *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015) effectively overturned *People v Williams*, 268 Mich App 416; 707 NW2d 624 (2005).

## I. BACKGROUND

This case started with the seizure of controlled substances following a warrantless search of Hines's house during his period of parole and a later search of his person following his arrest in June 2021. Hines was previously convicted of delivery of heroin less than 50 grams and possession with intent distribute less than 50 grams of heroin in 2016. He was paroled in 2019. As a condition of his parole, he was required to allow certain searches of his property related to his status as a parolee. In June 2021, Hines was also on bond in a separate case involving drug charges arising from conduct in early 2020.[1]

Suspecting Hines of drug trafficking, a drug task force began surveilling Hines's apartment at least as early as May 2021. On June 15, 2021, during and in coordination with that surveillance, Michigan State Police (MSP) Trooper Andrew Dayfield stopped Hines for driving on a suspended license shortly after he left his apartment complex. Trooper Dayfield arrested him, searched him, put him in the front seat of the MSP patrol vehicle. During the search, Trooper Dayfield discovered that Hines was carrying a knife but he did not find any drugs or drug paraphernalia on Hines's person. Nor did he find any drugs, drug paraphernalia, or evidence indicative of drug trafficking in Hines's car.

After Hines's arrest but before transporting him to the Monroe County Jail, Trooper Dayfield took Hines back to his residence, where task force members searched Hines's apartment. During the search, there were times when the police left Hines unattended in the front seat of the patrol car, albeit handcuffed and secured in place with a seatbelt. The police did not seek or obtain a warrant to search Hines's residence because he was on parole. During the search, police located lottery tickets (presumably Keno tickets or slips) that had not been filled out or played. The lottery tickets had residue that field-tested positive for cocaine. During the search of Hines's residence, Captain Brent Cathey, a Monroe Police Department captain assigned to the task force, recovered a clear plastic bag "containing another torn-off clear plastic baggie, knotted, containing a white rock substance." Captain Cathey testified that he believed the substance was crack cocaine (i.e., cocaine base), but did not submit it to a laboratory for forensic testing. He also recovered a clear plastic bag containing cocaine residue from the trash.

Trooper Dayfield eventually transported Hines from his residence to the Monroe County Jail where a corrections officer searched Hines again. Trooper Dayfield testified that he asked Hines several times if "he had anything else on him," following the initial search, and Hines said he did not. Nonetheless, Trooper Dayfield believed he may have overlooked something in the first search because, in his view, Hines was acting suspiciously. During the search at the jail, a corrections officer located controlled substances and other contraband in Hines's "inner groin area." Specifically, the corrections officer found a clear plastic bag containing 36 white tablets

---

[1] In the 2020 case, Hines was eventually convicted of two counts of delivery of less than 50 grams of cocaine, MCL 333.7401(2)(a)(*iv*), and one count of maintaining a drug house, MCL 333.7405(1)(d), again as second or subsequent drug-related offenses under MCL 333.7413(1). *People v Hines*, unpublished per curiam opinion of the Court of Appeals, issued September 7, 2023 (Docket No. 358479).

and 31 "bindles," which Trooper Dayfield described as "a lottery ticket cut up into pieces, folded up, usually containing some type of narcotics." There was no evidence of Hines making a statement during the search.

At trial, in addition to evidence of Hines's surveillance, arrest, and searches, as well as the seizure of the contraband, the prosecution presented a forensic analysis regarding the contraband. Lauren Tenglin, who was qualified to testify as an expert in forensic controlled substance analysis, described her testing and findings related to three items she received related to this case. The first item contained 0.97 grams of a mixture of methamphetamine and cocaine. This underpinned the methamphetamine conviction. The second item consisted of 31 small folded paper packets with tan powder inside. Tenglin tested the powder from one packet and determined it to be fentanyl mixed with diphenhydramine (Benadryl). The fentanyl and paper packet that was tested collectively weighed 0.3092 grams. She testified that she did not test the remaining 30 packets in accordance with the MSP forensic science division's policy not to test "redundant samples." The tested substance and envelope, along with the 30 untested envelopes, were the "bindles" seized from Hines that underpinned the fentanyl conviction. The third and final item contained 36 rectangular white tablets. Tenglin testified that she believed the tablets were alprazolam (commonly, Xanax), but her testing indicated that the tablets did not contain any form of controlled substance.

At trial, Captain Bren Cathey and Commander Derek Lindsey, Monroe Police Department officers previously assigned to the drug task force, testified about common features and methods of drug trafficking and drug use. This is sometimes called "drug profile evidence." Captain Cathey testified that his investigatory experience allowed him to differentiate between "user amounts of narcotics and delivery amounts of narcotics." He testified that, in his experience, fentanyl is usually sold in 0.1 or 0.2-gram amounts, and methamphetamine is usually sold in 0.2-gram amounts. Captain Cathey, who helped search Hines's residence, testified that the police found lottery tickets that matched the evidence later found on Hines. He explained that drug dealers commonly use lottery tickets that have not been filled out or played to package drugs like heroin and fentanyl. Captain Cathey also testified that he could distinguish paraphernalia associated with use from that associated with trafficking. He testified that police did not find pipes, needles, or straws—items associated with drug use—during the search of Hines's residence.

On cross-examination, Captain Cathey acknowledged that there were items commonly associated with drug trafficking that the police did not locate during their investigation. For example, he agreed that drug dealers commonly carry large quantities of currency but the police did not locate cash on Hines or during the search of Hines's residence. Likewise, he acknowledged that MSP searched Hines's cell phone for evidence of text messages related to drug deals, but there were not any messages indicative of drug transactions.

The prosecution also introduced drug-profile evidence through the testimony of Commander Lindsey, who the trial court qualified to testify as an expert in controlled substance enforcement. He testified about the common packaging, sale amounts, and methods of use for methamphetamines and fentanyl. According to Linsey, methamphetamine is commonly sold in quantities of half a gram to one gram, though most users only consumed approximately 0.2 grams at a time. He usually saw methamphetamine packaged in the corners of plastic bags or folded into paper packets. Commander Lindsey explained that fentanyl can be snorted but the majority of the

time is injected with a needle intravenously. Fentanyl was usually sold in 0.1 to 0.2-gram packets. It was commonly packaged in lottery ticket papers from a party store or in small ziplock bags. He opined that the 31 bindles of fentanyl recovered from Hines were indicative of packaging for delivery because of their number. He explained that addicts tended to go through heroin or fentanyl "like candy" and ordinarily only had one to three packets in their possession at a time. A user with the financial means might purchase more at one time, but "you're very rarely gonna come across users with 30 packets, 31 packets."

Commander Lindsey also testified about imitation controlled substances and diluted controlled substances. He stated that "pill pressing"—creation of imitation prescription pills—had become increasingly common in the last several years since the federal government began regulating prescription drugs more heavily. When that happens, a drug dealer may pack and sell the imitation substance like genuine substances. According to Commander Lindsey, it was also common for drug dealers to dilute controlled substances with other products to increase profits. Commander Lindsey recalled "a stretch there where we were getting' a lot of Benadryl being sold as heroin and fentanyl . . . ."

Finally, Commander Lindsey indicated that some drug dealers sometimes, but not always, carry cash. Lindsey speculated that if Hines did not have any money with him, it could be because "he'd recently re-upped and used his money to purchase a quantity that he packaged up for sale or he hadn't made any sales yet."

Hines was convicted on each count submitted to the jury: one count of possession with intent to deliver methamphetamine, one count of possession with intent to deliver less than 50 grams of fentanyl, and one count of possession with intent to deliver imitation controlled substances. Three previously-charged counts, including driving with a suspended license, were dismissed prior to trial.

The trial court sentenced Hines in August 2022. At the sentencing hearing, defense counsel objected to scoring 25 points for Offense Variable (OV) 19 because the circumstances of the case did not suggest that Hines meant to bring drugs or contraband into the jail. Instead, defense counsel argued that Hines happened to be in possession of the drugs at the time of his arrest, and the substances were only discovered during the second search at the jail. The prosecution argued that scoring 25 points for OV 19 was appropriate because police searched Hines earlier, asked him multiple times if he possessed any contraband, and advised that he could face an additional charge if he tried to bring contraband into the jail. The trial court agreed with the prosecution and scored 25 points for OV 19 over defense counsel's objection. This and other enhancements resulted in an advisory guidelines range of 84 to 140 months' imprisonment for the methamphetamine convictions (Count 1) and 29 to 57 months' imprisonment for the fentanyl conviction (Count 2). At sentencing, the prosecution argued that the trial court could double the sentencing guidelines for the fentanyl conviction, pursuant to the controlled substance second offense notice, which would increase them to 57 to 114 months' imprisonment.

As stated, the trial court sentenced Hines to 120 to 480 months' imprisonment for the methamphetamine conviction, 114 to 480 months' imprisonment for the fentanyl conviction, and 32 to 48 months' imprisonment for the imitation-controlled-substance conviction. The sentence for the fentanyl conviction appears to reflect that the trial court imposed a minimum sentence that

-4-

was double the high end of the advisory guidelines range. When pronouncing sentence, the trial court stated:

> In this matter, the sentencing guidelines are 84 to 140. They can be doubled as a result of . . . controlled substance second offense. There are seven felonies and four misdemeanors. Mr. Hines was on parole for the very same offense at the time this happened.
>
> As the prosecutor pointed out, sentence must be consecutive as to count two because he was on parole and he committed . . . a major controlled substance offense while the case was pending. The other cases are discretionary, although they are mandatory as it pertains to parole.

The trial court then addressed defense counsel's argument regarding a withdrawn plea agreement and noted that Hines was "within his rights" to demand a trial. It then pronounced sentence, stating that it found the sentence to be reasonable and proportionate. Aside from noting that the sentencing guidelines could be doubled, it did not explain its decision to double the guidelines when imposing Hines's sentence for the fentanyl conviction. It entered a judgment and commitment consistent with its pronouncement.

By the time of sentencing, Hines was already serving a prison sentence for a 2020 case. As stated, the conduct underpinning this case occurred while Hines was on bond for the 2020 case. Therefore, at the time of sentencing, there was a question as to whether the trial court would sentence Hines concurrently or consecutively with his 2020 conviction. The trial court concluded that it had discretion to order the methamphetamine conviction and the imitation-controlled-substance convictions to run consecutively or concurrently to the 2020 conviction under MCL 768.7b(2)(a), but found that the fentanyl conviction carried a mandatory consecutive sentence because it was a major controlled substance offense under MCL 768.7b(2)(b). In September 2022, the trial court entered an amended judgment that was identical with the first, with the exception of a notation stating that all counts were to run concurrent to each other, but consecutive to Hines's parole stemming from case no. 20-245722.

This appeal followed. During oral argument, we asked the parties where the trial court derived this authority to double the sentencing guidelines instead of doubling the statutory minimum sentence as indicated by the plain text of the statute. See MCL 333.7413(1). Following oral argument, Hines, through counsel, moved to file a supplemental brief (with the proposed brief attached). Hines also requested that we expand the scope of the appeal to address whether *Williams*, 268 Mich App 416, "which reads MCL 333.7413 to empower trial courts to double an individual's guidelines, is wrongly decided because the sentencing guidelines are now advisory." The prosecution responded, arguing that *Williams* was not wrongly decided. We granted the motion to expand the scope of the appeal.

## II. WARRANTLESS SEARCH

Hines argues for the first time on appeal that the warrantless search of his residence violated his rights under the United States Constitution and Michigan Constitution to be free from unreasonable searches and seizures. He also argues that his trial counsel was ineffective for failing

to move to suppress the fruits of that search. Both arguments fail because Hines cannot demonstrate outcome-determinative prejudice.

The underlying search-and-seizure claim is unpreserved and therefore subject to plain-error analysis. *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020). As stated in *People v Brown*, ___ Mich App ___, ___; ___ NW3d ___ (2024), slip op at 3 (N. P. HOOD, J., concurring):

> To obtain relief under the plain-error rule, a defendant must prove that (1) an error occurred, (2) the error was plain, and (3) that the plain error affected substantial rights—in other words, the error affected the outcome of the proceedings. *People v Anderson*, 341 Mich App 272, 280; 989 NW2d 832 (2022). If a defendant satisfies these three requirements, we must determine whether the plain error warrants reversal, in other words, whether it seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. [*People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).] Sometimes identified as a fourth prong of plain-error analysis, this last step conceptually overlaps with the third prong. [*People v Davis*, 509 Mich 52, 75-76; 983 NW2d 325 (2022).]

Hines, however, preserved his ineffective-assistance-of-counsel claim by moving before this Court to remand for a *Ginther*[2] hearing. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Whether trial counsel's conduct denied a defendant effective assistance of counsel is a mixed question of fact and constitutional law. *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018). We review constitutional issues de novo. *Id.* We review the trial court's findings of fact, if any, for clear error. *Id.* Where, like here, there was not an evidentiary hearing on the ineffective-assistance claim, our review is limited to mistakes apparent on the record. *Id.*

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000). See also US Const, AM IV; Const 1963, art 1, § 11. Our courts, however, have interpreted the right to be free from unreasonable searches and seizures absent a warrant based upon probable cause to be "subject to several specifically established and well-delineated exceptions." *Kazmierczak*, 461 Mich at 417. One such exception to the warrant requirement is for searches covered by the so-called "governmental special needs" or "regulatory" exception. See *People v Woods*, 211 Mich App 314, 317; 535 NW2d 259 (1995). In the context of searches performed pursuant to this exception, neither a warrant nor probable cause are required as long as the search meets "reasonable legislative or administrative standards." *Id.*, citing *Griffin v Wisconsin*, 483 US 868, 873; 107 S Ct 3164, 3168; 97 L Ed 2d 709 (1987). As this Court observed in *Woods*, the special needs exception has generally provided a basis for the search of a parolee's residence where there were reasonable grounds to believe that the probationer was in possession of contraband See *Woods*, 211 Mich App at 317 (addressing "special needs" exception in the context of a warrantless

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-6-

administrative search of the home of a defendant who was placed in a community residential program, MCL 791.265g(e), a type of preparole release for Michigan Department of Corrections (MDOC) inmates).

Hines argues that the warrantless search of his residence was unreasonable and unconstitutional because there was no connection between the search and the "parole process." He contends it was the product of an "inchoate hunch" following his arrest for driving on a suspended license. The record tells a different story. Prior to his arrest, the police had reason to believe he was distributing controlled substances. A confidential informant had purchased what he believed to be heroin (later identified as fentanyl) from Hines three weeks before his arrest. After his arrest on June 15, an MDOC agent went with task force officers to Hines's residence to conduct a compliance search, which is when they discovered the evidence at the residence. Put simply, there was more than an inchoate hunch that Hines had controlled substances at his residence. At a minimum, this would violate standard terms of parole, such as not committing other crimes and prohibitions on possession and use of controlled substances without lawful authority. See *People v Idziak*, 484 Mich 549, 571; 773 NW2d 616 (2009) (explaining that the purpose of parole is to keep an individual in legal custody while permitting them to live outside of prison so they may have the opportunity to show that they can refrain from committing other crimes). As such, this would satisfy the reasonable legislative and regulatory needs contemplated by the "special needs" exception to the warrant requirement. See *Woods*, 211 Mich App at 317. We acknowledge that satisfying this requirement can be a low hurdle. See *Samson v California*, 547 US 843; 126 S Ct 2193; 165 L Ed 2d 250 (2006) (holding that a suspicionless search of a parolee, conducted pursuant to a California statute requiring parolees to agree in writing to be subject to search and seizure with or without a warrant or cause, satisfied the requirements of the Fourth Amendment).

For this reason, Hines argues that we should not follow United States Supreme Court precedent on the "special needs" exception to the warrant requirement, arguing that Michigan's constitution provides broader protection. We also acknowledge, without deciding, that Michigan's constitution may provide more extensive protections than the federal constitution when it comes to "special needs" searches. See *People v Montgomery*, 508 Mich 978, 979 (2021) (WELCH, J., concurring) ("At least for purposes of Michigan law, it remains unsettled what privacy interests a parolee retains and whether a parole search is lawful when it is not 'directly and closely related' to the administration of the parole supervision system."). But Hines's argument still fails because he cannot demonstrate that the evidence obtained during the search of the residence affected the outcome at his trial. Captain Cathey described the evidence seized during the search of Hines's residence. He testified that the police discovered white residue on the kitchen table that field-tested positive for cocaine, blank lottery tickets that were commonly used to package drugs like heroin and fentanyl, a white rock substance that was believed to be crack cocaine, and a plastic bag with cocaine residue. The discovery and seizure of drugs from Hines's person were unrelated to the search of the residence. So, suppression of the evidence seized during the search of the residence would not impact the most critical evidence in this case.

Nonetheless, Hines argues that without this evidence, it is probable that the jury would not have found sufficient evidence of his intent to deliver. We disagree. In addition to the evidence seized at Hines's residence, the prosecution presented evidence that Hines was arrested with nearly a gram of methamphetamine, 31 bindles of fentanyl, and 36 tablets of imitation alprazolam.

Commander Lindsey explained the significance of these quantities, indicating that the amounts of methamphetamine and fentanyl were far in excess of the amounts an average user would consume at once.[3] More critically, Hines did not have any paraphernalia in his possession that could facilitate personal use. Especially coupled with the individual packaging of the fentanyl in discrete bindles, this evidence substantially undermined any suggestion that Hines was carrying the drugs for personal use. Consequently, Hines cannot establish that admission of the evidence discovered in his home affected the outcome of his case.

For this same reason, i.e., failure to establish prejudice, Hines's claim of ineffective assistance of counsel also fails. See *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) ("establishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Prejudice means a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotation marks and citation omitted)). Even if he could establish that counsel was deficient for failing to move to suppress the warrantless search, he cannot establish that it would have affected the outcome.

## III. DRUG PROFILE EVIDENCE

Hines also argues that the trial court improperly allowed the prosecution to use drug profile evidence as substantive evidence of guilt. We agree that some of the drug profile evidence was inadmissible, but some of the evidence was proper. Captain Cathey and Commander Lindsey both came close to crossing the line into opining on Hines's guilt or making direct comparisons between Hines's conduct and their stated "drug profile" conduct. But Hines cannot establish that the improper drug profile evidence affected the outcome of the trial.

This Court uses harmless-error analysis to measure the effect of improperly admitted drug profile evidence. *Williams*, 240 Mich App at 321. When assessing a defendant's nonconstitutional allegation of error, the test is whether " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *Id.*, quoting *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999).[4]

We have previously described "drug profile evidence" as an " 'informal compilation of characteristics often displayed by those trafficking in drugs.' " *People v Murray*, 234 Mich App

---

[3] Even if we exclude the impermissible drug profile evidence described below, the prosecution offered permissible drug profile testimony to support this conclusion.

[4] Hines argues that he preserved this issue for appeal through defense counsel's objections at trial. A granular review of the transcript indicates that the defense, though consistently objecting, may not have objected to the most damning portions of Captain Cathey or Commander Lindsey's profile evidence testimony. If that is the case, plain-error analysis would apply to the unpreserved claim of evidentiary error. *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022). We need not resolve the preservation issue because even under the more permissive harmless-error standard, Hines cannot demonstrate a likely impact on the outcome. See *Williams*, 240 Mich App at 321-322.

46, 52; 593 NW2d 690 (1999), quoting *People v Hubbard*, 209 Mich App 234, 239; 530 NW2d 130 (1995). Because these characteristics involve what can also be innocuous behavior, like possessing large amounts of currency, two cell phones, or a digital scale, drug profile evidence is inherently prejudicial in that it "may suggest that innocuous events indicate criminal activity." *Murray*, 234 Mich App at 52 (quotation marks and citation omitted). Trickier still is when these characteristics indicate not innocuous conduct, but criminal conduct that does not amount to drug trafficking, such as drug residue in a kitchen or on a Keno ticket, which may indicate illegal use, trafficking, or both. Cf. *id.* For these reasons, drug profile evidence is generally inadmissible as substantive evidence of guilt, but trial courts may admit it to explain the significance of other evidence. *Id.* at 53. We have recognized that "there is often a very fine line between the probative use of profile evidence as background or modus operandi evidence and its prejudicial use as substantive evidence[.]" *Id*. at 54. "[O]nce the profile is found to be relevant to the case, the court will often be faced with a gray area in which it may be obvious that the criminal profile circumstances and characteristics closely resemble those of the defendant, yet also in which the use of the profile may be the only way to explain to the jury the circumstantial evidence in the case." *Id*. at 55.

Trial courts therefore must make a case-by-case determination to allow drug profile testimony that "aids the jury in intelligently understanding the evidentiary backdrop of the case, and the modus operandi of drug dealers, but stop short of enabling profile testimony that purports to comment directly or substantively on a defendant's guilt." *Id*. at 56. To assist in this analysis, we have identified four nonexhaustive factors that bear on this issue:

> *First*, the drug-profile evidence must be offered as background or modus operandi evidence, and not as substantive evidence of guilt, and the distinction must be carefully maintained by the attorneys and the court. *Second*, something more than drug profile evidence must be admitted to prove a defendant's guilt; multiple pieces of profile do not add up to guilt without something more. *Third*, the trial court must make clear to the jury what is and is not an appropriate use of the drug-profile evidence by, e.g., instructing the jury that drug-profile evidence is properly used only as background or modus operandi evidence and should not be used as substantive evidence of guilt. *Fourth*, the expert witness should not be permitted to express an opinion that, on the basis of the profile, defendant is guilty, and should not expressly compare the defendant's characteristics to the profile in a way that implies that the defendant is guilty. [*Williams*, 240 Mich App at 320-321, citing *Murray*, 234 Mich App at 56-57.]

Hines's challenge implicates the fourth factor: whether the drug profile testimony amounted to opinion testimony on his guilt. Captain Cathey and Commander Lindsey both provided drug profile testimony. Both witnesses provided permissible drug profile testimony and testimony that crossed the line into impermissible comments on Hines's guilt. Considering the total body of evidence, we conclude that Hines cannot established that but for the impermissible testimony, the trial would have had a different result.

We start with the impermissible testimony. Captain Cathey testified that the police did not find pipes, needles, or items associated with drug *use* (as opposed to trafficking) during the search of Hines's residence. This likely crossed the line into opinion testimony because it directly linked

-9-

general characteristics to the evidence identified in this case. He also vaguely opined that the quantity of drugs Hines had was not indicative of personal use.[5]

Parts of Commander Lindsey's testimony was more clearly inadmissible. Commander Lindsey opined that the 31 bindles of fentanyl recovered from Hines were indicative of packaging for delivery because of the number. This was inadmissible because it was essentially an opinion of Hines's guilt. See *Williams*, 240 Mich App at 320. Likewise, his comment that a user might purchase more than one bindle but "you're very rarely gonna comma across users with 30 packets, 31 packets" was impermissible. It linked common traits directly to the facts of this case. See *id*. Finally, Lindsey speculated on why Hines might not have money with him suggesting that he "recently re-upped." This too was impermissible. See *id*. at 321.

To assess whether this erroneously-admitted drug profile testimony affected the outcome, we consider what other evidence remained for the jury to consider. Separate from the impermissible drug profile evidence, both Captain Cathey and Commander Lindsey provided admissible drug profile evidence. Both testified about the typical amounts of fentanyl and methamphetamine users possess: between 0.1 and 0.2 grams. Both testified about drug packaging and the use of lottery tickets to package heroin and fentanyl. A jury could rely on this evidence and find that Hines's possession of numerous packets of small amounts of drugs was evidence of trafficking. Likewise, a jury could rely on the drug profile information about lottery tickets being used as trafficking vessels. It is difficult to say that the impermissible drug profile evidence made a difference. Though inadmissible, under the facts of this case, it arguably made explicit connections a reasonable jury would have already made. Hines has not established that but for this evidence there probably would have been a different outcome.

IV. OV 19

Hines argues that the mere possession of drugs at the time of his arrest was an insufficient basis to assess 25 points under OV 19 for purportedly threatening the security of a penal institution. We agree with this principle and remand for the trial court to apply it to this case. We therefore vacate the sentence and remand to the trial court to making findings on whether there was sufficient evidence of Hines's intent to bring controlled substances *inside* the penal facility as opposed to incidental possession during his arrest and intake.

We review factual findings concerning the sentencing variables for clear error. *People v Sours*, 315 Mich App 346, 348; 890 NW2d 401 (2016). Such findings must be supported by a preponderance of the evidence. *Id*. "Clear error exists when we are left with a definite and firm conviction that a mistake was made." *People v Abbott (On Remand)*, 330 Mich App 648, 654; 950 NW2d 478 (2019). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory

---

[5] We note that Captain Cathey also provided opinion testimony that benefited the defense. In his testimony, he acknowledged that the police did not recover paraphernalia indicative of drug trafficking such as scales or large amounts of currency.

interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

The trial court erred by assessing 25 points for OV 19 because, on the record before us, there was no evidence that Hines possessed the controlled substances inside the penal facility, or otherwise engaged in conduct that threatened the security of a penal institution.

OV 19 concerns a "threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services." MCL 777.49. A trial court may properly assess 25 points for OV 19 when "[t]he offender by his or her conduct threatened the security of a penal institution or court." MCL 777.49(a). MCL 777.49(a) requires a court to find "(1) that the defendant engaged in some conduct and (2) that conduct threatened the security of the prison." *People v Dixon*, 509 Mich 170, 177; 983 NW2d 385 (2022). Possession of a dangerous item or substance alone can satisfy the first requirement (i.e., conduct) and, depending on the nature of the item possessed, satisfy the second requirement (i.e., a threat to the security of the facility) as well. *Id*. at 179-180.

Neither this Court, nor our Supreme Court, has directly addressed whether mere possession of controlled substances during intake at a penal institution (as opposed to possession inside an institution) satisfies this enhancement under OV 19. We have held that *smuggling* a controlled substance into a prison satisfies this enhancement. *People v Dickinson*, 321 Mich App 1, 23; 909 NW2d 24 (2017) (recognizing that intentionally bringing a controlled substance into a prison "inherently puts the security of the penal institution at risk."). See also *People v Carpenter*, 322 Mich App 523, 528-532; 912 NW2d 579 (2018). Indeed, "delivery of an unquestionably dangerous drug like heroin into the confines of [a] prison threaten[s] the safety and security of both the guards and the prisoners . . . ." *Id*. at 23-24. And our Supreme Court has held that *possession* of certain items *within a penal institution*, without more, can trigger the 25-point enhancement. See *Dixon*, 509 Mich at 178-180 (concluding that possession of a cell phone inside a penal institution satisfied the first prong (conduct) of OV 19 but holding that OV 19 was improperly scored because mere possession of a cell phone was not inherently a threat). But see *Dixon*, 509 Mich at 194 (BERNSTEIN, J., dissenting) (questioning whether it would be more appropriate to focus on intent, rather than conduct). Though not requiring intent, in each case, the conduct at issue necessarily included an action (if not intent) to have the dangerous item *inside* the penal institution. Cf. *id.* at 174-175. See also *Dickinson*, 321 Mich App at 23 (involving attempt to bring controlled substances into a prison). See also *Carpenter*, 322 Mich App at 528-532 (same).

Here, there was no finding that Hines possessed the drugs *inside* the penal institution or attempted to bring them *inside*. The prosecution opined that OV 19 was properly scored because police previously search Hines, asked him multiple times whether he had any contraband in his possession, and advised him that he could face an additional charge if he tried to bring contraband into the jail. Despite these warning, Hines remained silent. The trial court agreed with the prosecution and overruled Hines's objection to the scoring of OV 19. This was incorrect. Recognizing our prior holdings that the presence of controlled substances in jails poses an inherent threat to the security of those institutions, *Dickinson*, 321 Mich App at 23-24, we focus our inquiry on possession. Here, there was no evidence that Hines possessed or attempted to possess controlled substances inside the jail, as opposed to being caught with drugs and not providing a

-11-

self-incriminating statement when the police did not initially find them. He possessed the drugs at intake, but police found them before he was incarcerated. This is far from the conduct contemplated by *Dickson*, *Carpenter*, or the plain text of the statute, see MCL 777.49(a). To affirm the scoring of OV 19 on the record before us would essentially amount to requiring a defendant caught with drugs to either accept a sentencing enhancement or give up their rights against self-incrimination. It would also create a moral hazard by potentially incentivizing law enforcement personnel to refrain from finding drugs until an individual was processed at a jail. The simpler solution is to apply the enhancement as written: did Hines through his conduct threaten a penal institution. See MCL 777.49(a). This would require an inquiry of whether the evidence shows that Hines possessed the drugs inside the penal institution or attempted to do so. We remand for the trial court to make findings on this issue and determine whether OV 19 actually applies. If the evidence is only that Hines incidentally possessed drugs at the time of his arrest and there is not a preponderance of the evidence of his possession or attempted possession *inside* the facility, then OV 19 does not apply.

## V. DOUBLING THE AUTHORIZED SENTENCE AND DOUBLING THE GUIDELINES

Hines argues that the trial court abused its discretion by doubling his authorized sentence, arguing that the trial court was required to articulate its reasons for doing so to comply with the principle of proportionality. This is essentially two related arguments. First, Hines asks us to extend the principles outlined in *People v Norfleet*, 317 Mich App 649, 662-666; 897 NW2d 195 (2016), to discretionary sentencing decisions under MCL 333.7413(1). Second, he argues that the trial court did not sufficiently articulate its reasoning under those principles. The prosecution does not appear to challenge extending *Norfleet* to discretionary increases in sentences under MCL 333.7413(1), but rather the prosecution argues that the trial court adequately explained its reasoning. We agree that the principles outlined in *Norfleet* apply to discretionary sentencing decisions under MCL 333.7413(1). But applying those principles to this case, we conclude that the trial court did not abuse its discretion by choosing to double the statutory maximum term.

Whether to enhance a sentence for a second or subsequent drug offense under MCL 333.7413 is within the trial court's discretion. *People v Green*, 205 Mich App 342, 345-346; 517 NW2d 782 (1994). This Court reviews such decisions for an abuse of discretion. See *People v Fetterley*, 229 Mich App 511, 525; 583 NW2d 199 (1998).

In relevant part, MCL 333.7413(1) provides that "an individual convicted of a second or subsequent offense under [the controlled substances article, MCL 333.7101 *et seq*., of the Public Health Code, MCL 333.1101 *et seq*.,] may be imprisoned for a term not more than twice the term otherwise authorized . . . ." Our Supreme Court has construed this language as permitting the trial court to double both the minimum and maximum terms of imprisonment. *People v Lowe*, 484 Mich 718, 731-732; 773 NW2d 1 (2009).[6] The trial court did just this to Hines's statutory

---

[6] At the time *Lowe* was decided, the quoted language appeared in MCL 333.7413(2). It was since moved to MCL 333.7413(1) when the statute was amended by 2017 PA 266.

maximum when it sentenced him to 114 to 480 months' imprisonment for the fentanyl conviction.[7] His unenhanced statutory maximum sentence was 20 years. See MCL 333.7401(2)(a)(*iv*). The trial court increased it to 40 years. Hines does not dispute that MCL 333.7413(1) authorizes this. Instead, he argues that he is entitled to resentencing because the trial court failed to sufficiently articulate its reasons for exercising its discretion under MCL 333.7413(1) or otherwise explain why its chosen sentence was proportionate.

Hines's claim of error is premised on the argument that the principles discussed in *Norfleet*, 317 Mich App 662-666, ought to be extended to MCL 333.7413. *Norfleet* involved MCL 333.7401(3), another statutory sentencing provision relating to drug offenses. *Id*. at 664. More specifically, MCL 333.7401(3) provides that the sentence for certain drug offenses "may be imposed to run consecutively with any term of imprisonment imposed for the commission of another felony." *Norfleet* observed that "appellate review of sentences imposed by the trial court must ensure that the sentences imposed comply with the principle of proportionality" outlined in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), and that the ability to review discretionary sentencing decisions to ensure a trial court has not abused its discretion was a central proposition in *Milbourn*. *Norfleet*, 317 Mich App at 662-663. We reasoned that because the decision to impose consecutive sentences under MCL 333.7401(3) was a discretionary matter, that decision was likewise reviewable for an abuse of discretion. *Id*. at 664. *Norfleet* then adopted the "default" abuse of discretion standard articulated in *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003)—that is, whether the decision was within the range of reasonable and principled outcomes—as the controlling standard in reviewing a trial court's imposition of a discretionary consecutive sentence. *Norfleet*, 317 Mich App at 664. *Norfleet* further held that "[r]eview of a discretionary decision requires that the trial court set forth the reasons underlying its decision." *Id*.

There is no binding authority extending *Norfleet*'s analysis to the discretionary doubling of the authorized sentence term under MCL 333.7413(1) or directly addressing how exercise of such discretion should be reviewed. But in a two-justice concurrence, our Supreme Court implicated the issue in *People v Kuieck*, 507 Mich 1002 (2021) (CAVANAGH, J., concurring). There, Justice Cavanagh (joined by Justice Welch) concurred in the Court's denial of an application for leave to appeal. Although the justices ultimately agreed with the majority's denial of leave to appeal because the defendant did not raise the sentencing issue before the Supreme Court, Justice Cavanagh agreed that *Norfleet*'s reasoning was equally applicable in the context of MCL 333.7413(1). *Id*. at 1003. She explained:

> The statute states that "an individual convicted of a second or subsequent [drug-related] offense under this article *may* by imprisoned for a term not more than twice the term otherwise authorized . . . ." MCL 333.7413(1) (emphasis added). Therefore, a defendant's prior drug-related conviction allows, but does not require, a trial judge to double a sentence, leaving the decision to the sentencing judge's discretion. As with discretionary consecutive sentences, the principle of

---

[7] As discussed later, the trial court also "doubled the guidelines." It imposed a minimum sentence of twice the high end of Hines's guidelines range. It did this instead of doubling the minimum allowed sentence. This implicates an issue the Court permitted the parties to add to this appeal.

proportionality suggests that this sentencing decision should be reviewed for an abuse of discretion. *Norfleet*, 317 Mich App at 663. If that were so, continuing the logic of *Norfleet*, the sentencing court would be required to set out the reasons for its decision to impose a double sentence. *Id*. at 664. The trial court would need to go beyond simply stating that a defendant has a prior drug-related conviction. Prior drug-related convictions vest the sentencing court with the discretion to impose a double sentence, but the rationale for doing so would need to be specific to the "seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636. [*Kuieck*, 507 Mich at 1003 (alteration in original).]

We are persuaded. Relying on this reasoning, we conclude that (1) a trial court must explain its reasons for opting to double the authorized sentencing terms under MCL 333.7413(1) in order to facilitate appellate review of that discretionary decision, and (2) appellate review of that decision must consider whether the decision fell within the range of reasonable and principled outcomes. Moreover, as suggested by Justice Cavanagh, because the existence of previous drug-related convictions is what opens the door to discretionary doubling under MCL 333.7413(1) and will therefore be true in every case involving this issue, that fact alone is an insufficient basis to double the authorized sentence terms. Instead, "the rationale for doing so would need to be specific to the 'seriousness of the circumstances surrounding the offense and the offender.' " *Id*., quoting *Milbourn*, 435 Mich at 636.

Having extended *Norfleet*'s principles to MCL 333.7413(1), we nonetheless conclude that the trial court sufficiently articulated its reasoning for doubling Hines's statutory maximum sentence. Although the trial court's explanation at sentencing was streamlined, it noted two factors that it deemed compelling in this instance: Hines's criminal history, which included seven felonies and four misdemeanors, and the fact that he was "on parole for the very same offense at the time this happened." The trial court's reasoning did not fall outside the range of reasonable and principled outcomes because it involved the specifics of Hines's offense and personal circumstances. Here, the trial court specifically observed that Hines committed the present offenses while on parole for an earlier possession-with-intent-to-deliver conviction, demonstrating an unwillingness to comply with the law even while still under the supervision of the MDOC. Under these circumstances, the trial court did not abuse its discretion by choosing to double Hines's statutory maximum term.

The trial court's handling of the minimum sentence is a different story. In addition to doubling the statutory maximum from 20 years to 40 years, the trial court also set the minimum sentence for Hines's fentanyl conviction at twice the high end of his unenhanced sentencing guidelines range. His unenhanced guidelines range was 29 to 57 months. The court imposed a minimum sentence of 114 months. It described this as "doubling" his guidelines. The trial court did this instead of doubling the minimum allowed sentence, which would have been 320 months, or ⅔ of 40 years, the new statutory maximum. See MCL 769.34(2)(b) ("The court shall not impose a minimum sentence, including a departure, that exceeds ⅔ of the statutory maximum sentence). See also MCL 333.7413(1) (providing that "an individual convicted of a second or subsequent [drug] offense . . . may be imprisoned for a term *not more than twice the term otherwise authorized*." (emphasis added)); MCL 333.7401(2)(a)(*iv*) (providing an unenhanced statutory maximum of 20 years).

-14-

The trial court derived its authority from *People v Williams*, where this Court interpreted MCL 333.7413 to allow trial courts to double a defendant's guidelines range. *Williams*, 268 Mich App at 423-430. There, we affirmed a trial court's decision to "double the guidelines range and choose the minimum sentence from within that range under MCL 333.7413(2)" when the defendant had two prior qualifying convictions. *Williams*, 268 Mich App at 726. We acknowledged that MCL 333.7413 empowered a sentencing court to double the statutory maximum and statutory minimum sentences. *Williams*, 268 Mich App at 428-431. Because, at the time, the sentencing guidelines were mandatory, we read MCL 333.7413 as allowing the trial court to double the guideline range and choose a sentence from within that range. *See id*. at 430 (concluding that this interpretation fit the plain meaning of the statute, "because the inclusion of authorized minimum sentences for doubling purposes, which necessarily includes a sentence imposed under the mandatory guidelines, falls within the clear language of the statute."). We appeared to acknowledge this limitation. Cf. *id.* In other words, when the guidelines were mandatory, the minimum permitted sentence was a sentence within the guidelines. See *id.* So, any authority to double the minimum sentence had to include doubling the guidelines. See *id.*

Under the sentencing framework at the time *Williams* was decided, this was a reasonable, if not the correct conclusion. However, the portion of the opinion that permitted doubling the guidelines range under MCL 333.7413 has been overruled by *Lockridge* and subsequent laws. The sentencing guidelines are no longer mandatory. *Lockridge*, 498 Mich at 365. And the Legislature has redefined the minimum permitted sentence as ⅔ of the statutory maximum. See MCL 769.34(2)(b). Thus, the backdrop against which we decided *Williams* no longer exists.

Through this lens, we again consider the statutory language. MCL 333.7413(1) provides, "an individual convicted of a second or subsequent offense under this article may be imprisoned for a term not more than twice the term otherwise authorized or fined an amount not more than twice that otherwise authorized, or both." Post-*Lockridge*, the minimum allowed sentence is no longer limited to twice the sentencing guidelines range. Rather, the enhanced minimum could be up to ⅔ of the new statutory maximum. See MCL 769.34(2)(b). The trial court would just be required to articulate its reasoning for increasing the statutory maximum, its reasoning for departing from the guidelines, and its reasoning supporting the extent of the departure. We, therefore, conclude that the trial court erred by "doubling the guidelines."

In sum, we conclude that the principles stated in *Norfleet* apply to a trial court's decision to increase the statutory maximum under MCL 333.7413. The trial court adequately stated its reasons for increasing the statutory maximum in Hines's case. The trial court, however, erred by doubling the guidelines. Post-*Lockridge*, MCL 333.7413 has no effect on the advisory sentencing guidelines. It does, however, potentially increase the statutory minimum. See MCL 769.34(2)(b). We remand for resentencing under these terms.

## VI. DISCRETIONARY CONSECUTIVE SENTENCING

Hines argues that the trial court abused its discretion by failing to adequately explain its decision to impose discretionary consecutive sentences for his fentanyl conviction (Count 1) and his imitation-controlled-substance conviction (Count 2) under MCL 768.7b(2). We agree.

We review a trial court's decision to impose discretionary consecutive sentences for an abuse of discretion. *People v Baskerville*, 333 Mich App 276, 290; 963 NW2d 620 (2020). An abuse of discretion occurs when "the trial court's decision was outside the range of reasonable and principled outcomes." *Norfleet*, 317 Mich App at 654.

The trial court did not identify its rationale for ordering Hines's methamphetamine (Count 1) and imitation-controlled-substance (Count 6) sentences to be served consecutive to his sentences stemming from other felony charges that were pending at the time he committed these offenses. The failure to state its reasoning for imposing a discretionary consecutive sentence amounted to an abuse of discretion. See *Norfleet*, 317 Mich App at 654. We therefore remand for the trial court to explain its reasoning.

"In Michigan, concurrent sentencing is the norm, and a consecutive sentence may be imposed only if specifically authorized by statute." *Baskerville*, 333 Mich App at 289 (quotation marks and citation omitted). One such statute is MCL 768.7b, which, includes the following provisions:

> (2) Beginning January 1, 1992, if a person who has been charged with a felony, pending the disposition of the charge, commits a subsequent offense that is a felony, upon conviction of the subsequent offense or acceptance of a plea of guilty, guilty but mentally ill, or nolo contendere to the subsequent offense, the following shall apply:

> (a) Unless the subsequent offense is a major controlled substance offense, the sentences imposed for the prior charged offense and the subsequent offense *may* run consecutively.

> (b) If the subsequent offense is a major controlled substance offense, the sentences imposed for the prior charged offense and the subsequent offense shall run consecutively. [Emphasis added.]

Use of the permissive term "may" in a statute signals the Legislature's intent to leave the permissive action to the discretion of the trial court. *Davis*, 337 Mich App at 77.

At the time of the instant offenses, Hines was on bond in connection with additional drug charges arising from his criminal activities in early 2020. He was subsequently convicted of two counts of delivery of less than 50 grams of cocaine, MCL 333.7401(2)(a)(*iv*), and one count of maintaining a drug house, MCL 333.7405(1)(d), again as second or subsequent drug-related offenses under MCL 333.7413(1). *People v Hines*, unpublished per curiam opinion of the Court of Appeals, issued September 7, 2023 (Docket No. 358479). Hines acknowledges that his methamphetamine and imitation-controlled-substance convictions were subject to discretionary consecutive sentences pursuant to MCL 768.7b(2)(a) because he committed those felonies while the 2020 felony charges were pending. But as he did with respect to the previous issue, Hines maintains that he should be resentenced because the trial court did not adequately explain its reasons for ordering that the methamphetamine and imitation-controlled-substances convictions be served consecutive to his sentences for the 2020 convictions.

-16-

As noted earlier, *Norfleet* involved a consecutive sentencing challenge that arose under a different statute authorizing discretionary sentences. *Norfleet*, 317 Mich App at 664. Nonetheless, this Court has already recognized *Norfleet* as broadly extending to other discretionary consecutive sentencing decisions. See *Baskerville*, 333 Mich App at 290 (considering violation of a human-trafficking statute). As such, the trial court was required to articulate its reasons for ordering each consecutive sentence. *Id*.; *Norfleet*, 317 Mich App at 665.

The record does not reflect the trial court's reasoning. The prosecution argues that the trial court's reasons for doubling Hines's fentanyl sentence applied to its consecutive sentencing as well. We disagree. After noting the sentencing guidelines range, the trial court said:

> They [the guidelines] can be doubled as a result of . . . controlled substance second offense. There are seven felonies and four misdemeanors. Mr. Hines was on parole for the very same offense at the time this happened.
>
> As the prosecutor pointed out, sentence must be consecutive as to count two [the fentanyl conviction] because he was on parole [sic: had a pending felony charge] and he committed a major criminal substance—a major controlled substance offense while the case was pending. The other cases [sic: convictions] are discretionary, although they are mandatory as it pertains to parole.

The trial court's reference to Hines's criminal history and parole status were mentioned in the context of its discretion to double Hines's authorized terms of imprisonment under MCL 333.7413, and there is no indication that it applied the same reasoning to the discretionary consecutive sentences imposed under MCL 768.7b(2)(a). Rather, the trial court only noted its discretion in relation to this issue without further comment concerning its exercise of that discretion. We therefore remand to allow the trial court to articulate its rationale for imposing consecutive sentences and retain jurisdiction so we may properly review the trial court's reasoning for an abuse of discretion. *Norfleet*, 317 Mich App at 666.

## VII. IS MANDATORY CONSECUTIVE SENTENCING CRUEL OR UNUSUAL?

Finally, Hines argues that the mandatory consecutive sentence required by MCL 768.7b(2)(b) constituted cruel or unusual punishment. We disagree.

The previous issue concerned the discretionary consecutive sentencing provision of MCL 768.7b, while this issue concerns mandatory consecutive sentences required by the same statute. More specifically, under MCL 768.7b(2)(b), "[i]f the subsequent offense is a major controlled substance offense, the sentences imposed for the prior charged offense and the subsequent offense *shall* run consecutively." (Emphasis added.) A major controlled substance offense includes a violation of MCL 333.7401(2)(a). See MCL 761.2(a). Hines's fentanyl conviction satisfied this definition because it involved a violation of subdivision (*iv*) of MCL 333.7401(2)(a). As such, the trial court was required to order the sentence for his fentanyl conviction to be served consecutive to his sentences for the felony charges that were pending at the time the fentanyl conviction was committed. See *Lockridge*, 498 Mich at 387 ("As we have stated many times, 'shall' indicates a *mandatory* directive."). See also *People v Chambers*, 430 Mich 217, 226; 421 NW2d 903 (1988)

(discussing legislative intent to deny discretion concerning consecutive sentences when a major controlled substance offense is committed while free on bond for an earlier felony offense).

The punishment provision of the Michigan Constitution is broader than its federal counterpart inasmuch as it prohibits cruel *or* unusual punishment. *People v Parks*, 510 Mich 225, 241; 987 NW2d 161 (2022). "[U]nder the Michigan Constitution, the prohibition against cruel or unusual punishment include[s] a prohibition on grossly disproportionate sentences." *People v Burkett*, 337 Mich App 631, 636; 976 NW2d 864 (2021) (quotation marks and citation omitted; alterations in original). In assessing this issue, courts consider four factors:

> (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation. [*People v Jarrell*, 344 Mich App 464, 484; 1 NW3d 359 (2022) (quotation marks and citation omitted).]

Concerning the first factor, consecutive sentencing has been recognized as "strong medicine" that should be exercised only with full awareness of the punitive effect it will have. *Chambers*, 430 Mich at 231. Its purpose is to enhance the punishments of those individuals who, because of repeated criminal activity, pose an unusual safety risk to the public. See *id*. at 229 & n 15. Hines has committed multiple offenses for which the trial court could impose consecutive sentences, suggesting that his criminality is more severe than other offenders. Committing a subsequent felony offense while an earlier felony charge is pending is especially concerning because it undermines the bond system; absent the deterrent of consecutive sentencing, "a person could be assured of 'one free crime' because of the usual policy of concurrent sentencing." *People v Smith*, 423 Mich 427, 450; 378 NW2d 384 (1985). This factor weighs against Hines's requested relief.

Concerning the second factor, i.e., the penalty imposed for the offense compared to penalties imposed for other offenses in this state, *Jarrell*, 344 Mich App at 484, Hines identifies several other situations in which mandatory consecutive sentencing is required in Michigan: (1) when a person commits a crime while incarcerated or upon escaping from incarceration, MCL 786.7a(1), (2) when a person commits a felony while on parole, MCL 768.7a(2), (3) when a person breaks or escapes prison, or attempts to do so, MCL 750.193(1), (4) when a person breaks or escapes jail, or attempts to do so, MCL 750.195(2), (5) when an imprisoned person takes another person as a hostage, MCL 750.349a, (6) when a person escapes incarceration while awaiting examination, trial, arraignment, or sentence for a felony, MCL 750.197(2), and (7) when a person possesses a firearm during the commission of a felony (felony-firearm), MCL 750.227b(3). Apart from felony-firearm, these circumstances all involve a common theme, namely, a prior relationship with the criminal justice system—a theme shared by the mandatory consecutive sentencing required by MCL 768.7b(2)(b). This factor weighs against Hines's requested relief as well.

Hines argues that MCL 768.7b(2)(b) is distinguishable because it requires consecutive sentencing based on conduct that occurred while he still had a presumption of innocence with respect to the earlier offenses, whereas the majority of the circumstances outlined above involve a person who has been convicted and sentenced for the earlier offense. We find Hines's distinction

unpersuasive because MCL 768.7b(2)(b) mandates consecutive sentencing with respect to "the sentences imposed for the prior charged offense and the subsequent offense." By necessity, then, it can only ever apply when the person subject to its terms is in fact convicted and sentenced for *both* offenses. As our Supreme Court confirmed in the context of discretionary consecutive sentencing under the former MCL 768.7b, the ability to impose consecutive sentences is given to "the court last in time to impose sentence." *Chambers*, 430 Mich at 231. Thus, if Hines was not actually convicted of the earlier offenses, the mandatory consecutive sentencing provision would be a moot issue.

Concerning the penalty imposed in Michigan compared to the penalty imposed in other states, *Jarrell*, 344 Mich App at 484, Hines emphasizes that many states have reduced the punishments for "drug convictions" by eliminating mandatory minimum penalties for "some drug offenses," diverting drug users to "problem-solving courts," and declining to increase penalties for fentanyl-related crimes. His position lacks merit because it does not speak to the availability or requirement of consecutive sentences, which is the precise issue he challenges in this claim of constitutional error. In contrast, at least one other jurisdiction requires consecutive sentences under analogous circumstances. See, e.g., Tenn R Crim P 32(c)(3)(C).[8]

Lastly, Hines argues that the goal of rehabilitation is not advanced by punishing him more severely under these circumstances because research has shown no evidence that increased prison sentences lead to higher capacity for rehabilitation. Even accepting the assertions outlined in the various articles Hines cites, we are not persuaded that this factor favors Hines's requested relief. The consecutive sentencing scheme does not completely undermine the goals of rehabilitation. By Hines's calculations, he will be eligible for parole in approximately 16 years. During this period of incarceration, he will presumably have access to positive programming through the MDOC. Nor will the cumulative total of the minimum consecutive sentences expire at such a late stage in Hines's life that he will have no incentive to reform his ways.[9] Furthermore, it remains true that rehabilitation is not the only pertinent factor in sentencing. Rather, other policies are worthy of consideration as well, including general deterrence, specific deterrence, punishment, and incapacitation, and these considerations "may suffice to deflect a cruel and unusual punishment challenge." *People v Adamowicz (On Second Remand)*, 346 Mich App 213, 231; 12 NW3d 35 (2023), quoting *People v Fernandez*, 427 Mich 321, 339; 398 NW2d 311 (1986). Hines has proven that the lesser penalties he received for past offenses did not have a sufficient rehabilitative effect on him. The fact that Hines committed a major controlled substance offense while nearly identical charges were pending against him is, indeed, concerning and suggests that the fear of traditional

---

[8] The prosecution also suggests that Illinois has an analogous requirement, but the statutory provision cited by the prosecution, Ill Comp Stat 5/5-8-4(d)(8), no longer exists. Another provision of that statute, however, seems to authorize permissive consecutive sentencing. See Ill Comp State 5/5-8-4(c)(5) ("If a person admitted to pretrial release following conviction of a felony commits a separate felony while released pretrial . . . then any sentence following conviction of the separate felony may be consecutive to that of the original sentence for which the defendant was released pretrial or detained.").

[9] Hines was 31 years old at the time of sentencing.

sentencing would not deter him from engaging in such activities. Most critically, his repeated conduct also underscores the potential need for incapacitation.

Considering the totality of these factors, Hines has not demonstrated that the mandatory consecutive sentence required by MCL 768.7b(2)(b) constituted cruel or unusual punishment. He is, therefore, not entitled to relief with respect to this unpreserved claim of error.

## VIII. CONCLUSION

We affirm Hines's convictions but vacate the trial court's amended judgment of sentence and remand for resentencing. On remand, the trial court must reassess OV 19 and make specific findings on whether there was sufficient evidence of Hines's intent to bring controlled substances inside a penal facility as opposed to mere incidental possession during his arrest and intake. It must also resentence in light of our conclusion that, post-*Lockridge*, MCL 333.7413 no longer permits a trial court to double the sentencing guidelines. Finally, the trial court must reassess its discretionary decision to impose consecutive sentences under MCL 768.7b(2)(a) and, if it does so, must articulate its reasoning for imposing consecutive sentences. We retain jurisdiction.

/s/ Noah P. Hood
/s/ Allie Greenleaf Maldonado
/s/ Sima G. Patel

# Court of Appeals, State of Michigan

# ORDER

PEOPLE OF MI V DARIUS ANTHONY HINES

Docket No.    363151

LC No.        2021-246321-FH

Allie Greenleaf Maldonado
Presiding Judge

Sima G. Patel

Noah P. Hood
Judges

For the reasons stated in the opinion issued with this order, we REMAND this case for further proceedings. We retain jurisdiction. After the remand proceedings conclude, we will review the decisions that the trial court made during those proceedings and consider any remaining issues in this appeal. Any challenges to the trial court's decisions on remand must be raised in this appeal. Therefore, the parties and the trial court must not initiate a new appeal from an order entered on remand within the scope of this appeal. The Clerk of the Court is directed to reject the initiation of a new appeal from such an order.

Appellant must initiate the proceedings on remand within 56 days of the Clerk's certification of this order, and the trial court must prioritize this matter until the proceedings are concluded. As stated in Part IV of accompanying opinion, the trial court shall reconsider whether it is appropriate to assess 25 points for OV 19. If it continues to assess 25 points for OV 19, it shall identify how Appellant possessed or attempted to possess the controlled substances inside the penal facility. If it concludes that the controlled substances were possessed only during intake, it shall articulate how the possession was a threat to the facility. As stated in Part V of the accompanying opinion, the trial court shall recalculate the sentencing guidelines range with the understanding that the maximum potential punishment is doubled but the guidelines are not. To the extent the trial court's sentence results in a departure from the sentencing guidelines range, it shall articulate the reasons for such departure. As stated in Part VI of the accompanying opinion, the trial court shall articulate its decision to impose discretionary consecutive sentences for Appellant's convictions for possession with intent to deliver methamphetamine, MCL 333.7401(2)(b)(*i*), second or subsequent offense, MCL 333.7413(1) (Count 1), and possession of an imitation controlled substance with intent to distribute, MCL 333.7341(3), second or subsequent offense, MCL 333.7413(1) (Count 6), under MCL 768.7b(2). The proceedings on remand are limited to these issues.

The parties must serve copies of their filings in the trial court on this Court. Appellant must file with this Court copies of all orders entered on remand within seven days of entry.

Appellant must ensure the transcript of all proceedings on remand is filed in the trial court and this court within 21 days after completion of the proceedings.

_____
Presiding Judge



A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

_____January 16, 2025_____          _____
Date                                          Chief Clerk